TOWNSEND SAVINGS BANK AND OTHERS *vs.* MILO TODD AND
WIFE.

A savings bank, holding a satisfied mortgage, the equitable title being in *A*,
went into the hands of receivers, and while they were settling its affairs *A*
brought an action of ejectment for the land against *T* and his wife, who were
in possession. One of the receivers, who by arrangement with the other two
had charge of all legal matters connected with the receivership, consented to
*A*'s bringing the suit in the name of the bank on securing it against cost.
Held—

1. That if the consent of the receivers was necessary it might be given in an
informal way, and without any order of the court authorizing it.
2. But that the consent of neither the bank nor the receivers was necessary,
especially where they were protected from cost.

It is a general rule that where one person has an equitable title to land, and a
bare legal title is in another, the equitable owner has a right to use the name
of the legal owner whenever an action at law is necessary.

The wife of *T* claimed a title to the demanded premises, which were occupied
by her husband and herself. *A* made demand of possession upon *T* alone,
and in the name of the savings bank. Held—

1. That *T* being in possession with his wife, a demand upon him was sufficient.
2. That *A* had a right to make the demand in the name of the savings bank.

The act of 1875 provides that additional parties may be made plaintiffs by way
of amendment, upon such notice and such payment of costs as the court may
order. While the suit was pending *A* was allowed by the court to become an
additional party plaintiff. Held to be no error.

The statute is not limited in terms to actions on contracts, and, being a remedial
statute, and in the direction of a more liberal practice, is to be construed
liberally.

Where a mortgage has been satisfied after the law day, and a bare legal title
remains in the mortgagee, that title is sufficient to maintain ejectment, and if
conveyed to a third person, without an assignment of the mortgage, is suffi-
cient to enable such third person to maintain ejectment.

Where real estate is sold for taxes and is more than sufficient for the purpose,
the part sold must be a designated portion by metes and bounds, and not an
undivided interest, unless the interest of the tax debtor is already an
undivided one.

A sale by a tax collector must be conducted in the fairest manner. Any conduct
on his part which tends to prevent the attendance of bidders or a fair competi-
tion among those who attend, will ordinarily render the sale void.

An undivided interest in the land was sold at the tax sale to *J*, who afterwards
conveyed it with warranty to the wife of *T*. The present suit was ejectment
in the name of the savings bank and of *A* against *T* and his wife. It
appeared that one of the receivers, after *J* had purchased and before he sold
to the wife of *T*, informed *J*, in the absence of *A*, that the savings bank had
no claim on the property. Also that during the same time *A*, in reply to an

enquiry, told him that he had then no title to the property—that he ought to have one, but had not been able to get any; and that afterwards and before J sold the property A met him by appointment on the premises, and it was agreed that when A had obtained his title from the bank J should release his tax title for a reasonable consideration. J informed T, who was proposing to buy the property for his wife, of these declarations, and they influenced him in making the purchase, and also led J to give a warranty deed. J was vouched in upon the trial as a warrantor. Held—

1. That the declarations of the receivers, as the savings bank held only a bare legal title, could not affect A.

2. That A's declarations, qualified as they were, were not sufficient to estop him from claiming title

3. That if sufficient in themselves, yet T and his wife, receiving them only at second hand from J, could not set them up as an estoppel in their favor.

4. That J, being cited in to defend as a warrantor, stood in a position to avail himself of the estoppel, if the facts were sufficient to create one.

5. But that J, having obtained no title from the tax sale, was selling what he could not have kept, and was no worse off in having to return the price of the property to the defendants on his warranty, and therefore was not suffering any loss by being unable to set up the estoppel.

It did not appear in the case at what price J sold the property to the defendants. If he sold for less than the value, and was compelled on his warranty to pay them the full value, he would be a loser to the extent of the difference. But this was for him to show; there would be no presumption in his favor.

A party setting up an estoppel must always show, as an essential part of his case, that he will suffer a loss if he can not avail himself of the estoppel.

And an estoppel was intended only as a protection to a party against loss, not as a means of positive gain to him.

If J was liable to pay on his warranty a small amount more than he received, and could on this ground have set up the estoppel against the entire title of A, he would have been not merely protecting himself from loss, but making the estoppel a means of large gain.

It seems that a court of equity would adjust such a matter.

A conveyance by a person holding a bare legal title to the person holding the equitable title, is not void because of adverse possession in some other party.

EJECTMENT, brought to the Superior Court in New Haven County. The demanded premises were certain real estate known as the grist-mill property, containing a mill, with dam and water power. The Townsend Savings Bank was originally the sole plaintiff, but after the case came into court Alfred Todd and Theron A. Todd moved to be made additional plaintiffs, and that the declaration be so amended that they should be so described therein. The defendants objected to this, but the court allowed it. The case was tried to the court on the general issue and the following facts found.

On the 10th of November, 1868, Milo A. Todd, one of the defendants, executed and delivered to the Townsend Savings Bank a mortgage of the demanded premises, they being described therein as follows:—"A certain piece of land with the dwelling-house and all buildings thereon, situated in the town of North Haven, and bounded westerly and southerly by highway, northerly by land of Alfred Doolittle, easterly in part by land of said Doolittle and in part by land of the heirs of Nicholas Jones; excepting from the above land and included within the above boundaries a small piece of land with the bolt shop thereon, owned and occupied by S. Morse & Co. Also all and singular the mill-dam, water power, water rights, mill privileges and rights to flow with water other land belonging to said land and appurtenant thereto. Also all the water-wheels and grist machinery, with the machinery and fixtures belonging thereto, now on said premises, excepting also from this deed such water power as belongs to said S. Morse & Co."

The mortgage was given to secure the following note:—

"$5,000.   New Haven, Connecticut, November 10th, 1868. One year after date for value received we, Milo A. Todd as principal, and Thelus Todd, Alfred Todd and Samuel E. Merwin as sureties, jointly and severally promise to pay the Townsend Savings Bank, at their banking house in the city of New Haven, five thousand dollars, with interest payable semi-annually in advance, together with all taxes assessed upon said sum against said bank or the holder of this note.

Milo A. Todd,
Thelus Todd,
Alfred Todd,
Samuel E. Merwin."

Milo Todd received from the bank the $5,000 for which the note was given, and paid interest on the note to January 5th, 1871, since which time he has paid no interest, and has never paid anything on the principal.

Alfred Todd signed the note solely as surety, and for the accommodation of Milo Todd, and prior to the mortgage had

no title or interest in the mortgaged premises, but the same belonged exclusively to Milo Todd.

In 1871 the sureties were very desirous that the note should be paid by Milo Todd, or by the Quinnipiac Paper Company, to whom he had transferred a portion of the mortgaged premises, and who had agreed in consideration of the transfer to assume and pay the mortgage. The sureties thereupon notified the bank that it must not extend the time on the note, and the bank, thinking that if it received interest for six months in advance that would create an extension of credit, told Milo Todd that it could not receive interest in advance, but the principal must be paid. He did not pay the principal, but offered to pay the interest. The bank then notified the sureties that it would look to them for the note.

On the 3d of July, 1871, Alfred Todd executed and delivered to the Townsend Savings Bank his own note for $5,300, and secured the same by mortgage upon real estate owned by him. He understood this new note to be given as collateral security for the original $5,000 note, which last note was to be collected from Milo Todd, or out of the mortgaged property as soon as it could be, but at the expense of Alfred Todd.

On the 31st of July, 1871, the bank made the following application of the $5,300 note:—There was added to the original $5,000 note six months interest on the same from January 5th, 1871, then six months interest in advance on the new $5,300 note, which was at once endorsed on the same, and then the sum of $14.10, being the expenses attending the $5,300 mortgage, making a total of $5,375.09; then there was deducted from that sum the $5,300 note, leaving a balance of $75.09, which at first was represented simply by a memorandum ticket, and some time afterwards by a due bill from Alfred Todd, which due bill was afterwards paid.

On the regular books of the bank, July 31st, 1871, the $5,000 note was entered as satisfied by the substitution of the $5,300 note. Alfred Todd did not know what entries were made on the books of the bank concerning the transaction.

At the time the due bill was given, the bank offered Alfred Todd a quit-claim deed of the mortgaged premises and the

$5,000 note, but he did not receive the same, preferring that the bank should continue to hold the title to the note and mortgage, hoping that thereby he could cause Milo Todd and the owners of the mortgaged property to pay the same more readily than if the papers stood in his own name, and the bank acquiesced in this arrangement.

On the 15th of November, 1870, the Quinnipiac Paper Company, a joint stock corporation, received from Milo Todd a deed of that portion of the premises mortgaged to secure the $5,000 note, known as the grist-mill property, which portion constitutes the demanded premises. The other portion known as the dwelling-house property is not in issue in this suit.

This company held possession and ownership of the demanded premises until September 6th, 1873, when it transferred the same to George D. Blodgett, of New Haven, who owned the same on the 1st day of October, 1873.

On the 31st day of August, 1874, an undivided seven-eighths of the demanded premises was sold by L. P. Tuttle, as tax collector of the town of North Haven, who on the 1st of September, 1874, gave a tax sale deed thereof to George W. Jones of North Haven.

On the 2d day of May, 1872, Alfred Todd caused to be brought to the May term, 1872, of the Superior Court in New Haven County, a petition to foreclose the $5,000 mortgage in the name of the Townsend Savings Bank, but at his expense, and against the Quinnipiac Paper Company, then the owner in fee of the demanded premises. The company appeared by counsel to defend the suit, and at the May term, 1874, the savings bank obtained a decree of foreclosure against the company, fixing the first Monday of July, 1874, as the time for redemption.

The savings bank at the commencement of the foreclosure proceedings did not know that the same were brought, but did know soon afterwards, and that they were brought in its name, and it made no objection thereto.

On the 28th of November, 1874, no redemption having been made under the decree, Alfred Todd caused to be filed

in the town clerk's office of North Haven a certificate of absolute title under the foreclosure in due form of law. The certificate was made out by the attorney whom he had employed to bring the suit, and signed by him as attorney for the bank. The attorney was paid for his services by him, and made no charge to the bank. It was always the understanding between the bank and Alfred Todd, that if Milo Todd or the owners of the mortgaged premises should pay the bank the amount due on the $5,000 note, the bank would take and apply the same in cancellation of the $5,300 note.

On the 28th day of September, 1874, Jared E. Redfield, Tilton E. Doolittle, and Walter Osborn, were appointed receivers of the Townsend Savings Bank, and are still in the execution of their trust.

Soon after the receivers were appointed Alfred Todd, on two different occasions, applied to them for a transfer to himself of the premises mortgaged to secure the $5,000 note, but they then refused to give it to him, Mr. Osborn saying they could not give up any securities they had in the bank until the debt was paid.

Afterwards, on the 28th of April, 1875, the receivers brought a petition to the Superior Court to foreclose the $5,300 mortgage, and on the 27th day of March, 1877, obtained a decree of foreclosure, limiting Alfred Todd's right of redemption to July 2d, 1877. He did not redeem, but the property was of sufficient value to pay and did pay the amount of the decree in the case.

On the 16th of May, 1877, the receivers executed and delivered to Alfred Todd a quit-claim deed of the premises in North Haven mortgaged to the savings bank by Milo Todd.

The bank has never released the premises to Milo Todd or any person claiming under him, unless it did so in whole or in part, by a deed to him executed on the 2d of March, 1869, the descriptive part of which is as follows:—

"Do remise, release, and forever quit-claim unto the said Milo A. Todd, his heirs and assigns forever, all such right, title, interest, claim and demand whatsoever, as the said Townsend Savings Bank have or ought to have, in or to the following

rights and privileges, viz: the right to take and convey from the flume connected with the dam upon the premises of said Todd situated in said North Haven, and heretofore mortgaged to said Townsend Savings Bank by deed dated November 10th, 1868, the description of said premises in said deed being as follows: A certain piece of land with the dwelling-house and all buildings thereon situated in the town of North Haven, and bounded westerly and southerly by highway, northerly by land of Alfred Doolittle, easterly in part by land of said Doolittle and heirs of Nicholas Jones; excepting from the above land and included within the above boundaries a small piece of land with the bolt shop thereon, owned and occupied by S. Morse & Co.; also all and singular the mill-dam, water power, water rights, mill privileges and right to flow with water other land belonging to said land and appurtenant thereto, excepting also from this deed such power as belongs to S. Morse and Co. in another flume, the necessary water for the purposes of the paper mill of said Todd on the stream below said dam.; the intention of this deed being to release such part of the mortgage above referred to as is set forth in the foregoing."

The object for which this conveyance was made and the intention of the parties as to the rights that should pass by it, are shown by the following consent to its execution, signed by the sureties on the note:—"The undersigned, indorsers on a note of Milo A. Todd to the Townsend Savings Bank, for five thousand dollars, hereby consent that said bank shall release to said Todd the right to take and convey from the present flume, on the property of said Todd mortgaged to said bank, by deed dated November 10th, 1868, as security for said note, in an open flume, the necessary water for the purposes of the paper mill of said Todd on the stream, below said pond.   New Haven, March 2d, 1869."

At the time the foreclosure proceedings were brought against the Quinnipiac Paper Company, Milo Todd was the general agent of the company, and as such agent employed counsel in the suit, and was fully aware of the nature of said proceedings. He also knew before the proceedings were

commenced that Alfred Todd, by reason of being surety on the $5,000 note, had given to the bank the $5,300 note, and secured the same by mortgage.

At the time of the execution and delivery of the quitclaim deed of the demanded premises, by the receivers of the savings bank to Alfred Todd, on the 11th of May, 1877, and for a long time previous thereto, a grantee of Jones, holding by a full warranty deed from him, with the usual covenants contained in such deeds, was in the open, exclusive and adverse possession of seven-eighths of the demanded premises, claiming to hold the same by a title paramount to any title derived from the mortgage of the same to the savings bank, and ever since that time to the present these seven-eighths have been thus exclusively and adversely held; and at the commencement of this suit and from a period prior to August 18th, 1877, the defendants were so exclusively and adversely holding the whole of the demanded premises against the claims of every other person.

On the 18th of August, 1877, Alfred Todd executed and delivered to Theron A. Todd a deed of the mortgaged premises.

The consideration of the deed to Alfred Todd from the receivers, was the fact that his real estate in New Haven, then under decree of foreclosure on the $5,300 mortgage, was of sufficient value to satisfy and would satisfy the original note of $5,000. The consideration of the conveyance from Alfred to Theron Todd was part payment of a debt due from the former to the latter.

The defendants claimed, but the plaintiffs denied, that evidence was admissible to impeach the validity of the foreclosure proceedings of the Townsend Savings Bank against the Quinnipiac Paper Company, and all the facts herein found, which might tend so to affect such proceedings, were found upon evidence which, so far as this point was concerned, was received subject to the plaintiffs' objection.

Theron Todd caused the present suit to be brought in the name of the Townsend Savings Bank, but at his own expense and risk, and amply securing the bank and the receivers from

all risk or loss thereby. Upon being advised that the suit should be brought in the name of the bank, he applied to Mr. Doolittle, one of the receivers, who was allowed by the other receivers to direct as to all legal questions, for permission to bring the suit in the name of the bank, and explained to him the reasons why, in the judgment of his counsel, the suit should be so brought; with which Mr. Doolittle was satisfied. Thereupon Mr. Doolittle, after providing that no loss could come to the bank or the receivers thereby, and assuming to act for all the receivers, consented that the suit might be brought in the name of the bank. Mr. Osborn, one of the receivers, did not know that the suit was brought in the name of the bank until some time afterwards. When it came to his knowledge he made no objection, and testified on the trial that if Mr. Doolittle authorized the suit to be so brought and the bank was protected, he made no objection thereto. Mr. Redfield, the other receiver, attended to matters outside the city. It did not appear whether he ever had or had not knowledge of the suit being brought.

Upon these facts the defendants claimed that the suit was brought without authority of the receivers, and asked its dismissal for that reason; the plaintiffs resisted this claim, and further contended that this defense was matter of abatement. If it be wholly a question of fact, the court finds that the suit was brought and is now pending, so far as the savings bank is concerned, by the authority of the receivers. If it be a question of law, it is reserved with the other questions arising in the case. No order of court authorizing the suit to be brought was made in the suit in which the receivers were appointed, which is still pending.

During the trial, because of the supposed uncertainty in whose name or names the suit should be brought, Alfred Todd and Theron Todd asked to be made plaintiffs by way of amendment, which was allowed against the defendants' objection and on payment of costs.

Before bringing the suit Alfred Todd and Theron Todd went upon the demanded premises, and finding Milo A. Todd there, demanded from him the possession of the same upon

Townsend Savings Bank *v.* Todd.

the title of the savings bank, but he refused to surrender the possession or any part thereof. It did not appear that Alfred or Theron Todd then told Milo Todd that they had themselves any title to the property, nor did it appear that any demand for the possession of the premises was ever made on Cornelia M. Todd.

The defendants claim title to seven-eighths of the demanded premises by warranty deed from Jones, dated June 20th, 1877, and the title of Jones is wholly derived from the deed of the tax collector before mentioned.

The plaintiffs objected to the admissibility and validity of the deed from the tax collector to Jones, on the ground that the sale was of an undivided seven-eighths of the property and not of a designated part by metes and bounds. (Sundry other objections made, mainly to the validity of the assessment and to the regularity of the proceedings of the tax collector are not noticed, as they were not considered by the court.) The plaintiffs also claimed that the tax sale was void by reason of the conduct of the tax collector at the time of the sale, which was as follows:—

A few minutes before the property was put up for sale, Tuttle, the tax collector, asked Jones not to bid on it, saying that a Mr. Morse was present, who owned property adjoining, and that he supposed Morse came there to bid on it, and he wanted Morse to have it; all of which he did in good faith. At the time and place advertised a few persons were in attendance. There were also two other sales advertised for the same time and place. Tuttle read the advertised notice of the sale of the land in question, and stated the amount of the tax, costs and percentages, and that the whole amounted to $19.45, and then called for bids. Mr. Morse offered to take all the property and pay the taxes and charges; Jones offered to take seven-eighths of the property and pay the taxes and charges. No other bids were made. Tuttle accepted the bid of Jones. The proceeding took about ten minutes, and the above is the substance of all that took place. The demanded premises at that time were worth from $4,000 to $5,000, and they were of about the same value when the decree of fore-

closure took effect the previous July in the case of the bank against the Quinnipiac Paper Company.

The defendants proved the following facts against the plaintiffs' objection, and claimed from them that the plaintiffs were estopped from claiming any title to the premises against the defendants.

Shortly after the tax sale Jones searched the title of Blodgett in the land records of North Haven. The certificate of foreclosure had not then been recorded, but he found the bank mortgage, and also heard that Alfred Todd claimed some interest in the premises. He then went to the bank and asked Mr. Osborn, one of the receivers, if the bank had any ownership in the Quinnipiac Mills, telling him that he had bid off the property for taxes, and what he had given. Mr. Osborn replied that the bank had no claim on the premises. Alfred Todd was not present. Soon afterward he met Alfred Todd and told him of the tax sale, and what he had bought and what he had paid for it, and asked him if he had any interest in or claim on the premises. He replied that he then had no title to the property; that he had had to assume the mortgage note of $5,000, and ought to have a title; but had none and could not get any. At the time Tuttle sold the property at the tax sale he had a letter from Alfred Todd, instructing him not to sell the property, as he had an interest in it. Jones met Alfred Todd again about the first of August, 1875, and told him the tax title would be good after the first of September. Todd replied, as before, that he had no title to the premises, but ought to have. On the 25th of January, 1876, Alfred Todd and Jones met by appointment on the premises, and Todd told Jones that he did not think his tax-title amounted to much, and Jones said it did; it was however agreed between them that when Alfred Todd could get his title from the bank, Jones would release his tax title to him for a consideration, but the amount of the same was not agreed upon.

In March, 1876, without notifying Alfred Todd that he was going to sell, Jones sold the undivided seven-eighths of the demanded premises to one Clinton for $800, and gave a war-

Townsend Savings Bank *v.* Todd.

ranty deed thereof.   Clinton soon after conveyed the same premises back to Jones by quit claim deed, and Jones on the 20th of June, 1877, gave a warranty deed thereof to Cornelia M. Todd.

Jones put seven-eighths of the demanded premises in his list for the year 1874, but afterwards in January, 1875, the board of relief took the same out of his list and added it to that of the Townsend Savings Bank, which was thus assessed therefor, and Alfred Todd paid the tax thus assessed.   In 1875 Jones again put the property in his list.   In 1876 and 1877 no lists were made out by any persons claiming to be owners.   Alfred Todd and Theron Todd have paid no taxes on the property except as above stated.

When Jones sold the property to Clinton and gave a warranty deed thereof, he was induced so to do by the consideration paid, and by the fact that he had a warranty deed from the collector, and by his belief that his tax title was perfect and was paramount to the mortgage or any title derived therefrom, and also by what Osborn and Alfred Todd had told him concerning the respective claims of the bank and of Todd to the premises.   He had not told, so far as appeared, any of the receivers that he was going to sell the premises or give a warranty deed thereof.

The plaintiffs specially objected to evidence of the above declarations of Osborn to Jones because the bank was only a nominal plaintiff, and because Osborn as a receiver and as one of three receivers could make no declaration affecting the interests of the bank on which an estoppel could be created.

On the above facts, so proved under objection, the defendants claimed that the plaintiffs and each of them were estopped from claiming title against the defendants.

The defendants have received $120 for the use of the demanded premises.

Jones was vouched in by the defendants, Milo A. Todd and Cornelia M. Todd, as a warrantor, and assumed the defense jointly with them.

Milo Todd negotiated the purchase from Jones in behalf of

VOL. XLVII.—26

his wife. The defendants offered evidence to prove that Jones told him during this negotiation, and before the purchase, that the bank receivers and Alfred Todd respectively had told him during the year next after the tax sale, that they had no title to or claim on or interest in the premises in question, and that these declarations thus reported had a material influence in inducing Milo Todd to make the purchase for his wife, and that he would not have purchased had he supposed the bank or Alfred Todd were going to set up a title. The plaintiffs objected to this as irrelevant and it was excluded:

Upon these facts the case was reserved for the advice of this court.

*J. W. Alling,* for the plaintiffs.

1. The mortgage title of November 10th, 1868, at the time of the commencement of this suit, was vested in the plaintiffs, or some of them, and was a foreclosed and absolute title. Milo A. Todd owned the property in fee, mortgaged it for his own benefit to the bank, and subsequently conveyed the grist-mill property (the demanded premises) to the Quinnipiac Paper Company, who assumed the mortgage. The bank brought to the Superior Court in 1872 a petition to foreclose the mortgage against the company, and at the May term, 1874, obtained a decree of foreclosure. So that, on the first Monday of July, 1874, when the time limited in the decree expired without redemption, the bank had the absolute title to the demanded premises. It is clear that the decree of foreclosure can not be attacked collaterally. It is conclusive as to all the parties and as against the present defendants who, if they have any title, hold one that is subsequent to the foreclosure. Nor do any facts in the record impeach the decree. The $5,000 note was not in fact paid, nor understood to be paid, by the new note of $5,300. It can not be an objection, least of all from Milo A. Todd, that the bank and Alfred Todd made an arrangement with each other, by which, while the bank was made secure, the mortgage was preserved upon the property for the benefit of the surety. No shadow of a wrong was thereby done to any party—and the mort-

gaged property was less in value than the amount of the debt. It is not material what sort of entries the bank made on its books relative to the notes, without the knowledge of Alfred Todd. He understood that he was putting up collateral security to the note on which he was liable as surety, and, at his request, the bank agreed that it would hold the title to the note and mortgage, and if the owners of the property paid the bank, it would of course cancel the $5,300 note. The receivers refused to transfer the mortgage title to Alfred Todd until the debt was paid. Subsequently they do so transfer the title, in such a manner as shows they thought the title foreclosed. The surety of a mortgage debt, on paying the debt, is entitled to a transfer of the mortgage. 1 Story Eq. Jur., § 499; *Edgerly* v. *Emerson*, 23 N. Hamp., 555; *Brewer* v. *Franklin Mills*, 42 id., 292. Ejectment lies in favor of a mortgagee, after forfeiture and the lapse of the law day, against the mortgagor, even though the debt has been paid. If the mortgagor has any relief it is in equity. Milo Todd and his wife, apart from the alleged tax title, have not a shadow of equity to this property. *Phelps* v. *Sage*, 2 Day, 151; *Dudley* v. *Cadwell*, 19 Conn., 227; *Cross* v. *Robinson*, 21 id., 387.

2. Has the title derived from this bank mortgage ever been destroyed by the proceedings to lay, assess and collect a tax against Blodgett? It is an elementary rule that, wherever it is sought to transfer title to real estate by a sale of the same for taxes, the proceedings, being *in invitum*, are to be construed with reasonable strictness. The directions of the statute must in all cases be substantially if not exactly followed. In no particular is there any legal presumption in favor of a tax title. The claimant must prove that the requirements of the statute have been observed with reasonable strictness, from the initial step of laying the tax to the final act of sale. *Hilton* v. *Bender*, 69 N. York, 81; *Merritt* v. *Portchester*, 71 id., 311; *Brown* v. *Veazie*, 25 Maine, 362; *Cahoon* v. *Coe*, 57 N. Hamp., 556; Blackwell on Tax Titles, 34, 73, 75, 77, 261, 293. The price usually paid is trifling, and hence it is peculiarly appropriate that strictness in

observing the requirements of the law should be exacted. "Acres for cents" is the usual result of a tax sale; in this case $5,000 for a $6 tax. *Hilton* v. *Bender*, 69 N. York, 81; *Farnum* v. *Buffum*, 4 Cush., 260; *Hughey* v. *Horrel*, 2 Ohio, 231; *Moore* v. *Brown*, 4 McLean, 211; Blackwell's Tax Titles, 51, 52, 68.—1st. The tax collector was bound to sell by metes and bounds. He had no power to create a tenancy in common. Blackwell's Tax Titles, 283, 4; *Wall* v. *Wall*, 124 Mass., 65. If the circumstances of the case gave him any such power, he should have so stated in the deed.—2d. The whole sale is vitiated by the conduct of the collector in endeavoring to dissuade persons from bidding for the property. He had no right to give any preference to one bidder over another, and to endeavor to secure the property to his friend Morse. It is true that Jones, who was requested not to bid, finally bought the property. There is a presumption that it would have brought more if the collector had not attempted to prevent bids. [Numerous other defects in the proceedings were claimed, but they are omitted from the report of the argument because not passed upon by the court.]

3. The defendants claim that the plaintiffs are estopped from attacking the tax title. But—1st. The doctrine of estoppel in *pais* does not affect or alter the legal title to real estate.—2d. Theron A. Todd is the real plaintiff, and there is no claim of an estoppel as to him. Jones could not convey the estoppel to the defendants. Estoppels in *pais* are not negotiable.—3d. Receiver Osborn could not make any admissions that would bind the bank, much less Alfred Todd, to whom in fact he had made a far different claim. *Rhodes* v. *Seymour*, 36 Conn., 1.—4th. Alfred Todd said nothing to Jones to lay the basis of an estoppel. He disputed the tax title, and explained his situation, and claimed that he ought to have the title from the bank.—5th. Whatever was said to Jones was without knowledge that he intended to sell, and least of all give a warranty deed, and Jones had, in good faith, no right to convey his alleged and disputed tax title to anybody else without giving Alfred Todd notice. The purchaser of lands at a tax sale "ought always to expect that the

owner will attempt to recover them." *Allen* v. *Smith*, 1 Leigh, 251.

4. The quitclaim deed from the savings bank to Milo A. Todd of March 2d, 1869, clearly does not convey the grist-mill property, but only the right to take water from the flume for his paper mill. The part which seems to embrace the mill property is merely a part of the description in the mortgage to the savings bank, and to make the entire deed understood should be embraced in a parenthesis.

5. In whose name or names should the suit be sustained? The statute (Gen. Statutes, p. 354,) provides that "all convey-ances of lands of which the grantor is ousted by the entry and possession of another, unless made to the person in actual possession, shall be void." At the time of the conveyance of the bank to Alfred Todd the bank was ousted of seven-eighths of the premises, and if the statute concerning the sale of pretended titles applied to that conveyance the bank and Alfred Todd would be tenants in common. The defendants claimed, under the authority of *Gunn* v. *Scovil*, 4 Day, 234, that the deed from the bank was not in any respect void under that statute. If the bank at and before the time of the con-veyance to Alfred Todd could have applied the premises to its own use, (and it seems clear that it could,) the statute did apply, and the bank and Alfred Todd became tenants in common. If the relations of the bank to Alfred Todd were wholly those of trustee and *cestui que trust*, probably the doctrine of *Gunn* v. *Scovil* is applicable. The addition of Theron A. Todd's name was perhaps not necessary. But in the actual trial of the case it was proper for the court, in order to insure a safe trial of the real questions at issue, to permit Alfred Todd and Theron Todd to be made plaintiffs, and if the cause of action should be sustained in favor of only a part of the plaintiffs, judgment should be rendered accordingly. The act of 1875 expressly allows such an amendment, and the statute should be liberally construed. *Nash* v. *Adams*, 24 Conn., 33; *Bulkley* v. *Andrews*, 39 id., 535; *Howland* v. *Couch*, 43 id., 50.

6. It was wholly a question of fact whether the name of

the savings bank was used in this suit by authority of the receivers. A joint session of the receivers was not legally necessary. It would be absurd to adopt any such rule. *Beecher* v. *Buckingham*, 18 Conn., 121. It was eminently proper that, if the suit must have been so brought, the receivers should consent to it. Besides, when a conveyance is rendered invalid by the statute concerning the sale of pretended titles, it has been decided that the grantee has the right to bring ejectment in the name of the grantor, just as an assignee of a chose in action (once under the ban of a similar statute) at common law must bring the action in the name of the assignor. *Hamilton* v. *Wright*, 37 N. York, 502; *Edwards* v. *Roys*, 18 Verm., 473; *University of Vermont* v. *Joslyn*, 21 id., 52; *Edwards* v. *Parkhurst*, id., 472; *Stockton* v. *Williams*, 1 Doug. (Mich.), 546.

7. A sufficient demand of possession was made before suit was brought. The defendants were both in possession although the title claimed was in the wife. In such a case a demand on either was sufficient. And it was not necessary that the demand should be for an undivided seven-eighths. The plaintiffs did not admit that the defendants had any right at all, and finding them in possession had a right to treat them as holding adversely the whole property. And it is expressly found that at the time of the demand "the defendants were exclusively and adversely holding the whole of the demanded premises against the claims of every other person." And the demand was properly made in the name of the savings bank. Alfred Todd having the equitable title had the same right to use the name of the savings bank in making demand that he afterwards did to bring the suit in its name.

*S. E. Baldwin* and *J. H. Whiting*, for the defendants.

1. It is necessary to inquire, first, whether the amendment to the declaration was properly allowed, so that we may know what allegations we are to meet. The right to amend was claimed under the act of 1875. The provision of the General Statutes, (p. 444, sec. 12,) which this purports to amend, refers merely to actions on contract against joint defendants,

where the proof, on the trial, has established a case against some, but not all, and the question is simply what judgment shall be rendered after the trial is closed. The new statute should have the same construction, and be confined to cases where an alleged joint liability is found by the court, on the evidence, to be in fact a several liability, or an alleged several right of action to be in fact a joint right. It ought not to be construed into permitting, in an action of tort at common law, the joinder of new plaintiffs, who claim no joint right, but only that, if the original plaintiff has no title, they, or one of them, may have. Parties ought not to be added unless they could with propriety have been originally joined, under a *bonâ fide* claim of a joint right. To join these parties when it is confessed that only one can have a title, is to subvert every notion of the design and object of the art of pleading. Again, in providing that new plaintiffs may be added "therein," the statute refers only to "suits where a cause of action shall be sustained in favor of or against only a part of the parties." But, in this case, the ground of the motion to amend was that they had not sustained a cause of action in favor of the bank; so that the statute does not apply. If the amendment was properly allowed, then we are called upon to meet allegations of a joint title in three parties, and a joint ouster, when no such joint interest is in fact pretended. We submit that the statute ought not to be strained so far as to sanction a recovery on *a* cause of action which is not *the* cause of action declared on, but something totally contradictory to it. If either plaintiff has a right of recovery, then the others can have none, and they decline to elect in which of them to claim the title to be.

2. The action should be dismissed, because brought without authority of the court, or even of the receivers of the bank. The receivers could only act in such a matter with the consent of all, and after a joint consultation. Kerr on Receivers, 149; High on Receivers, § 208; *Wynne* v. *Lord Newborough*, 1 Ves. Jr., 164; *Martin* v. *Lemon*, 26 Conn., 192. Even if Mr. Doolittle could assent for all, he never assented to such a suit as this has become, if the amendment is to

stand—a suit by the bank and two others, on a several and alternative title. This court should therefore advise the court below to grant the motion to erase the cause from the docket.

3. Is any ouster proved? We claim only seven-eighths of the mill as tenants in common. The only demand was made on Milo, at a time not shown, by Alfred and Theron, who demanded possession of the whole premises, not stating that they had any title, but claiming to represent the title under the bank mortgage. In fact, at this time, the bank had no title, having conveyed to Alfred Todd, who had probably already conveyed to Theron. Independently of the difficulty as to the party who made the demand, any demand by a co-tenant is insufficient unless it is confined to being let into a joint possession. *Wooster* v. *Hunts Lyman Iron Co.*, 38 Conn., 256, 258. And no demand at all was made upon Mrs. Todd, the real owner.

4. Have the plaintiffs, or any of them, a title to any part of the premises?—1st. We submit that the deed of the bank, of March 2d, 1869, released the grist-mill. The original mortgage embraced the dwelling-house parcel, the mill site, the mill privilege, "and also all the water-wheels and grist machinery, with the machinery and fixtures belonging thereto, now on said premises." The release deed recites so much only of the mortgage as refers to the dwelling-house parcel, the mill site, and the mill privilege, and then says: "the intention of this deed being to release such part of the mortgage above referred to as is set forth in the foregoing." Thus the bank released everything except the water-wheels and machinery, as the part of the mortgage referring to them is the only part of the mortgage not set forth in the release deed. The court has found that such was not the design of the release deed. That may be a ground for relief in equity, where we can show our equitable defences, but can not restore to them the legal title, on which this suit depends. In an action of ejectment the construction of such a deed is a matter of law, and cannot be varied by parol evidence that the grantors meant to release less than they did.—2d. The bank mortgage was satisfied by the Alfred Todd mortgage in July,

1871, before the foreclosure suit was brought. *Bonnell* v. *Chamberlin*, 26 Conn., 487, 492. This foreclosure, being obtained not only on a satisfied mortgage, but without the authority of the bank, and no ratification or adoption of it having been found, is a mere nullity. So the bank treated it in afterwards foreclosing the Alfred Todd mortgage, without giving him any credit for the $4,000 to $5,000, which was the value of the mill when the pretended foreclosure became absolute. And so Alfred Todd treated it in not mentioning it to Mr. Jones, when called upon after the tax sale, but speaking only of his having had to assume the mortgage.—3d. But if the bank mortgage had not been satisfied, ejectment would not lie upon it in favor of either of the plaintiffs. The bank cannot recover, because its legal title was conveyed to Alfred Todd. Alfred Todd and his grantee, Theron A. Todd, cannot recover, because they have not an assignment of the mortgage nor even of the mortgage note, but a mere quit-claim of the mortgaged land. They are strangers to the mortgage, and so can found no cause of action upon it. *Clinton* v. *Westbrook*, 38 Conn., 13. Moreover, Alfred Todd's claim to indemnification, as surety, was outlawed, before this suit, in July, 1877. If he held the $5,000 mortgage note as an unpaid and unforeclosed obligation it might be different.

5. Our tax title is good.—1st. The inadequacy of the price is unimportant. *Slater* v. *Maxwell*, 6 Wall., 268.—2d. The sale of an undivided portion of an entire and inseparable parcel of real estate, being the only way to sell less than the whole, was necessarily the proper way, in this instance, and is justified by the terms of the statute. (Gen. Stat. of 1866, p. 725, sec. 75.) If, as the plaintiffs claim, in one aspect of their case, the sale was subject to the bank mortgage, then it would be the common case of the sale of an undivided interest in an equity of redemption. *Ives* v. *Lynn*, 7 Conn., 505, 513.—3d. The collector's request to Jones not to bid, did not prevent the bid, or its success, and was made in good faith; and were it otherwise, it would be only a matter for relief in equity, upon a direct proceeding to set aside the sale. *Slater*

v. *Maxwell*, 6 Wall., 268. [The points made in reply to those omitted in the argument for the plaintiffs, are also omitted.]

6. Our point of estoppel is well taken. Mr. Jones, who has been vouched in as the warrantor of the defendants, and joins in the defence, acted in good faith, and with the greatest diligence. He was induced to deed with warranty by being told by both the bank and Alfred Todd that they had no title. They ought not now to set up that they in fact had a title. *Brown* v. *Wheeler*, 17 Conn., 345, 353; *Preston* v. *Mann*, 25 id., 128; *Grace* v. *McKissack*, 49 Ala., 163; *Horn* v. *Cole*, 51 N. Hamp., 287. And the evidence offered that Mrs. Todd was induced to buy by Mr. Jones's repeating the disclaimers of any interest, made by the bank and Alfred Todd, was, for the same reason, wrongfully excluded. *Martin* v. *Righter*, 10 N. Jer. Eq., 526; *Mitchell* v. *Read*, 9 Cal., 206; *M'Mullen* v. *Wenner*, 16 Serg. & R., 18, 22; *Crane* v. *Turner*, 67 N. York, 437.

7. The defendants, who were not parties to the bank foreclosure suit, were entitled to show the real facts attending this suit, which it is found that the bank never authorized, and it is not found that they ever ratified. *Beers* v. *Broome*, 4 Conn., 256.

GRANGER, J. Numerous questions are made in this case, which we will consider in their order.

1. It is claimed on the part of the defendants that the suit could not originally have been brought by the Townsend Savings Bank and the other plaintiffs, Alfred Todd and Theron A. Todd, as joint plaintiffs, and that therefore the court below had no power to allow the amendment by which the last named parties were made plaintiffs.

The act of 1875, under which the amendment was made, is as follows:—"In all suits where a cause of action shall be sustained in favor of or against a part of the parties thereto, judgment may be rendered in favor of or against such parties only;    *    *    *    and additional parties may be made plaintiffs by way of amendment, and additional defendants may be cited to appear therein, upon such notice and such

payment of costs by the plaintiff, as the court may prescribe."
Acts of 1875, p. 31.

It is contended that this statute, being an amendment of
the 12th section of chapter 14 of the act with regard to civil
actions (Gen. Statutes, p. 444,) is applicable only to suits
upon contracts, where it is uncertain beforehand whether the
right or liability is a joint or a several one—or, if joint, whether
it is so as to all the plaintiffs, or all the defendants, or only
as to a part of them. But it is not clear that the original
statute was intended to have this narrow application. It
speaks only of "a cause of action," without in terms limiting
it to causes of action upon contracts, and while the more
liberal construction falls in with the language used, we think
it falls in with the apparent intent of the legislature far more
than the restricted one claimed. The whole course of our
legislation has been in the direction of simple practice, and
against technical formalities, and we feel bound therefore to
construe this remedial statute liberally, and especially not to
restrict its meaning in the face of the language used in it.

2. The defendants next contend that the case should be
stricken from the docket, because the receivers of the savings
bank never authorized the institution of the suit in its name
by Alfred Todd, and that if they had done so it would not
have been sufficient without an order of the court giving them
authority to bring the suit or allow it to be brought.

With regard to the assent of the receivers, it is clear that
one given informally, and by the receivers acting separately,
was sufficient. No title passed or was expected to pass, no
right of any kind was affected or was expected to be affected,
by their action. They simply consented that Alfred Todd
might bring a suit in the name of the bank, at his own
expense, to recover possession of property which was equita-
bly his, and to which the bank had only a bare legal title if
any, and which therefore did not in any proper sense consti-
tute assets in their hands. And the same considerations
make it clear that it was not necessary that an order of the
court should be obtained before the suit was brought. This
order would be necessary only to empower the receivers to

institute a suit in their own name as receivers. If they already had the power under the statute authorizing their appointment, no such order would be necessary, except perhaps for the purposes of supervision by the court of all their proceedings, and the protection of the assets from waste by unnecessary or improper suits. But here the suit was brought, not in the name of the receivers but of the bank, and wholly at the expense and risk of Alfred Todd. If he had the equitable title to the property while a bare legal title remained in the bank, he would have had the right to use the name of the bank, without the consent of the receivers or the bank—certainly upon securing them against cost. It is a well settled rule that in any case where a bare legal title is held in trust, as where a grantor has conveyed to a grantee while the land was adversely held, the grantee may sue in law for the possession in the name of the grantor. He could of course go into a court of equity, if the case admitted of it, in his own name, but an action at law could be brought only in the name of the party holding the legal title; and the name of such party the *cestui que trust* has a right to use. *Wade v. Lindsey,* 6 Met., 413, 414; *Jackson v. Leggett,* 7 Wend., 380; *Stockton v. Williams,* 1 Doug. (Mich.), 547; *University of Vermont v. Joslyn,* 21 Verm., 52, 62; *Edwards v. Parkhurst,* 21 Verm., 472; *Wilson v. Nance,* 11 Humph., 191. But even if the suit could not have been brought in the name of the bank, and standing solely in their names as plaintiffs would have been liable to be stricken from the docket, yet with Alfred Todd and Theron A. Todd as additional plaintiffs there can be nothing in this objection that stands in the way of a judgment in their favor.

3. It is next objected that there has been no ouster—a proper demand of possession and a refusal to give possession being necessary to the ouster.

It is first said that the demand was made by Alfred and Theron Todd upon Milo Todd, one of the defendants, not upon any title of their own, but upon the title of the bank under the mortgage. If the bank held the legal title and they only the equitable title, the demand of possession was

properly made in the name of the bank, and they, as owning the equitable title, would be authorized to make the formal demand in the name of the bank. If they would not be so authorized as matter of law, yet there is a fair presumption that such authority was in fact given, there being nothing found to the contrary.

It is then claimed that the demand was not a legal one, because it was for the possession of the whole property, while the defendants own an undivided seven-eighths of it as tenants in common with them or the bank, and the demand should therefore have been to be let into joint possession with the defendants.

But the question whether the defendants own the seven-eighths depends upon the validity of the tax title conveyed or claimed to have been conveyed, by the tax collector to George W. Jones, under whom the defendants claim. This title will be hereinafter considered. If valid it constitutes a defence of itself, and we may therefore lay it out of the case in considering the objection now made.

It is then claimed that demand of possession was made only upon Milo A. Todd, and that none was made on Mrs. Todd, who was the real owner. But in ejectment it is not necessary that the demand be made on the real owner. It must be made on the person in possession. Here Milo Todd and his wife were in joint possession, and a demand in such case on him alone was sufficient. It can not affect the case that the fee was in his wife.

4. It is next contended by the defendants that the plaintiffs have no title to the demanded premises.

And in the first place they claim that the deed of the bank to Milo Todd, of March 2d, 1869, released to him the gristmill property, which is the property in dispute. But, while the deed is very awkwardly expressed, it is we think quite clear that it not only was intended to release, but does in fact release, only the right to take water from the flume for the paper mill owned by Todd on the stream below the dam.

It is then said that the bank mortgage was satisfied by the Alfred Todd mortgage of July 3d, 1871, and therefore could

not have been foreclosed by the bank in 1872. But if the mortgage was satisfied, it was yet an outstanding legal title in the bank, which if not released or conveyed would be sufficient to enable the bank to maintain ejectment, and which, having been conveyed to Alfred Todd on the 11th of May, 1877, by the receivers, gives him a sufficient legal title to enable him to maintain the suit.

It is further said by the defendants that Alfred Todd could not have recovered because he did not take an assignment of the mortgage when he took his quitclaim deed from the bank, and that Theron Todd taking title from him can not now recover. But the quitclaim deed conveyed the legal title held by the bank, and that is sufficient to recover upon in ejectment.

5. The defendants then set up their own title to seven-eighths of the grist-mill property.

Whatever title they have is derived from the tax title conveyed to George W. Jones by Tuttle, the tax collector, by deed dated September 1st, 1874. This title is assailed by the plaintiffs on numerous grounds, but there is one defect in it which is fatal to its validity, and this alone we will consider.

The statute which authorizes the levy of a tax warrant on the real estate of the tax debtor and its sale for the taxes (Gen. Statutes, 164, sec. 17,) provides that the tax collector shall " sell at public auction enough of said estate to pay the taxes and costs chargeable against the owner, and execute and deliver a deed thereof to the purchaser." This statute authorizes only a sale of such a designated portion of the real estate as may be necessary, and not a sale of an undivided interest, unless perhaps in those cases where the interest of the debtor is already an undivided one. It is not in the power of the officer thus to create a tenancy in common against the will of the owner of the land. He acts in hostility to the latter, and must pursue his authority literally. This principle is amply sustained by the authorities. *Loud* v. *Penniman,* 19 Pick., 539; *Wall* v. *Wall,* 124 Mass., 65; *Hodge* v. *Wilson,* 12 Smedes & Marsh., 498; Burroughs. on Taxation, 305; Blackwell on Tax Titles, 283. As the

collector had no power to sell an undivided interest the sale was absolutely void.

While it is not necessary for us to consider other objections to the tax title, there is yet one upon which we feel it our duty to remark.

It appears that at the auction sale by the collector and before the property was put up for sale, the collector requested Jones, who was attending as a bidder, and finally bought the seven-eighths which were sold, not to bid on the property, as a Mr. Morse wanted it and was present to bid for it, and he desired to have him have it. It is however found that the collector in saying this was acting in good faith. It is difficult to see how such a thing could be done in good faith, but we suppose the finding to mean that he had no actual intent to commit a fraud. The act was one however which the law would look upon as a gross violation of duty, and no ignorance of his duty on the part of the collector, or absence of a positively fraudulent intent, can excuse it. The collector was proceeding to sell the property of a tax-payer for his taxes—a power necessarily given to the cities and towns of the state, and vital to the existence of government, but one that should be exercised by the agents of the law with the utmost fairness, and with constant regard both to the requirements of the law and to the rights of the tax-payer; and any act on the part of the officer empowered to make such a sale which tends to prevent a fair competition at the auction, ought to render the sale void. Here it did not prevent Jones from bidding and finally bidding successfully, but how far it may have operated to prevent bids from others and have affected the whole sale, can not be known. It is very probable that if the collector made such a request of Jones, whom he saw present, he made a like request of others, and not improbable that, in his endeavor to secure the property for Morse, he may have dissuaded others from attending. It is clear that here was an officer of the law, entrusted with this most responsible and delicate duty, interesting himself in preventing a fair sale that a certain person who wanted to secure the property might get it below its value. Such a

thing the law will never tolerate. As, however, it is found that Jones did in fact bid for the property and purchased it at the sale, and as it is not necessary to a decision of the case that we determine what legal effect should be given to these acts of the officer, we express no opinion as to their effect upon the sale, but feel bound to express in the strongest manner our sense of the reprehensible character of the officer's conduct.

It is claimed however on the part of the defendants that the plaintiffs are estopped from asserting their title by reason of certain declarations of Mr. Osborn, one of the receivers of the bank, and of Alfred Todd, one of the plaintiffs, made to Mr. Jones, who purchased at the tax sale, to the effect in the case of Mr. Osborn, (Mr. Todd not being present,) that the bank had no claim on the premises, and in the case of Alfred Todd, that he then had no title to the property, but that he had had to assume the mortgage note of $5,000 and ought to have one, but could not get it. This was after Jones had bought the property, so that he was not induced to make the purchase by them. It appears however that he afterwards sold the property to Mrs. Todd, one of the defendants, and that she and her husband were induced to make the purchase by the statement to them by Jones of these declarations of Mr. Osborn and Alfred Todd, and that he himself was led to give a warranty of the title by his belief, induced by these declarations, that neither the bank nor Alfred Todd had any title. As he has been vouched in by the defendants upon his warranty and has assumed the defence with them, the question of the operation of the estoppel in his favor comes equally before the court.

There are numerous objections to the claim of estoppel, whether made by the defendants or by Jones, which are entitled to serious consideration, among which is the point made by the counsel for the plaintiffs, that an estoppel in pais can not be set up against a legal title in an action at law, but we pass them over, because we are clear that the declarations were not sufficient in themselves to constitute an estoppel.

The declaration of Mr. Osborn, that the bank had no claim

to the property, cannot affect the title of Alfred Todd. The bank held a bare legal title, the equitable interest being wholly in Todd. In these circumstances the receivers could not, by mere declaration or conduct, confess away his equitable rights.

And the declaration of Alfred Todd was not that he had no equitable right to the property. On the contrary it was substantially a declaration that he had such a right. He said that he had *then* no title to the property, which, taken with the rest of the conversation, fairly implied that he hoped to get one. He declared that he had had to pay the $5,000 mortgage, and ought to have a title to the property, but could not get it. Moreover this declaration, lacking as it does all positiveness of statement as to his not having an equitable right, was afterwards qualified by a later conversation, which however occurred before the sale of the property to the defendants. The sale to Clinton was not made till March, 1876, and that to the defendants, (Clinton having deeded the property back to Jones,) not till June, 1877. It is found that on the 27th of January, 1876, Alfred Todd and Jones met by appointment on the premises, and that it was agreed between them that when Todd could get his title from the bank, Jones would release his tax title to him for a consideration. It is not important that this consideration was not agreed on; the negotiation showed Jones that Todd claimed an equitable right to the property, and was trying to get a title to it. When at last he obtained the legal title he had obtained only what Jones well understood that he was trying to get. There was nothing in his declarations that estopped him in the slightest degree from afterwards obtaining this title, or that now estops him from asserting it.

But even if the declarations were of such a character as to constitute an estoppel, it is difficult to see how they can be taken advantage of in the present case. It is clear that the defendants, who received them merely at second hand through Jones, and for whom they were not intended, can not set them up as constituting an estoppel in their favor. *Kinney* v. *Whiton*, 44 Conn., 262; *Mayenberg* v. *Haynes*, 50 N. York,

675; *Morgan* v. *Spangler*, 14 Ohio St. R., 102. And although Jones is vouched in as a warrantor of their title and joins in the defence, yet it is difficult to see how he will be injured as such warrantor by a denial of the benefit of the estoppel. If he had bought the property upon the strength of the declaration of Alfred Todd that he had no title himself, he would be injured by having the title which he supposed he had obtained set aside in favor of Todd's title. He might have taken only a quit-claim deed, or if a warranty the warrantor might not be responsible. But here he parted with nothing. He had already bought the property, at his own risk, and for a nominal price. If he had no title, (as we must assume that he had not if we regard him as standing wholly on the estoppel,) then he sold the defendants land to which he had no title, making what he received for it so much clear gain. If now the plaintiffs recover in their suit and evict the defendants, and they resort to him on his warranty, he will be compelled to pay them back what he received, and when he has done so will stand exactly where he stood when the declarations were made which he is now endeavoring to treat as an estoppel. The only difference would be, that he then held land to which he had no title and which he would be compelled to give up, and now he holds its equivalent in money to which he has no better title, and which he will be compelled to give up. It is true that he may have sold the land to the defendants for less than its fair value, and on his warranty may be compelled to pay them a larger sum, the rule of damages being the value at the time of eviction. If this were the case he would be damaged to the amount of the difference. But if this is the case it was for him to have shown it. A party setting up an estoppel must always show, as an essential part of his case, that he will be subjected to loss if he can not set up the estoppel. There is no presumption in his favor. Here nothing is found with regard to the price paid by the defendants for the property.

And while in the absence of all proof on the subject there would be no room for the inference that it was sold for less than its value, it may fairly be inferred from the fact that

Jones believed he had a good title, and from his giving the defendants a warranty deed, that he obtained a reasonable price. And if he sold for something less than a fair price so as now to be liable on his warranty for a small amount beyond what he received, it would be a strange state of things that he should be allowed to stand upon an estoppel by reason of a loss of perhaps a hundred dollars, and secure to himself property worth four thousand or its money equivalent, and that with no title, and resting upon the estoppel alone; especially does such a result seem strange in view of the fact that an estoppel in pais operates wholly on equitable principles. How the law would deal with precisely such a case we are not called upon to consider, but it is very clear that the matter could be adjusted by some proceeding in equity. An estoppel was never intended to work a positive gain to a party, but its whole office is to protect him from a loss which but for the estoppel he could not escape.

We are compelled therefore to regard the tax sale as invalid, and the defendants without title. The only remaining question is, in favor of which of the plaintiffs shall judgment be rendered.

The legal title to the disputed premises, prior to the conveyance by the receivers to Alfred Todd, on the 11th of May, 1877, was clearly in the Townsend Savings Bank. This title the receivers conveyed at that time by a quit-claim deed to Alfred Todd. This was before the present suit was brought, and would clearly vest the title in him, unless, as the defendants claim, the fact that Clinton, the grantee of Jones, was then in adverse possession of an undivided seven-eighths of the premises, prevented the operation of the conveyance upon such seven-eighths. If this were so, then the deed to Alfred Todd would have conveyed to him the legal title to one-eighth, while the bank would have held the bare legal title to the other seven-eighths, and the recovery should be by them jointly. But the defendants are wrong in supposing that the ouster of the bank by Clinton could operate to invalidate the conveyance to Alfred Todd. A conveyance made by a trustee to the party holding the equitable title, is not a sale of a pre-

tended title. A release of the title by a mortgagee to the mortgagor, after the satisfaction of the mortgage, is not within the statute. *Gunn* v. *Scovill*, 4 Day, 234. Here the bank held the legal title under the mortgage, while Alfred Todd, having as surety paid the mortgage debt, had been subrogated to the beneficial interest held by the bank, and was now the equitable owner. A conveyance to him by the bank of the bare legal title in these circumstances, could not be affected by the adverse possession of the defendants. A full title therefore passed to Alfred Todd by the deed of the receivers.

But on the 18th of August, 1877, Alfred Todd, for a valuable consideration, in no way connected with the other transactions in the case, conveyed the premises to Theron A. Todd. This was also before the suit was brought. In the mean time Clinton had re-conveyed the property to Jones, who immediately after, on the 20th of June, 1877, had conveyed his interest in the premises by a warranty deed to Cornelia M. Todd, the wife of Milo Todd, and the said Milo and Cornelia were holding that interest adversely. Here the conveyance was not saved by any thing in its character or the relation of the parties from the operation of the statute, and was therefore void so f       the seven-eighths interest held adversely is concerned.       he one-eighth not so held passed by the deed, and a ba       legal title to the seven-eighths remained in Alfred Todd       They were therefore in law tenants in common at the ti       e the suit was brought, and the recovery should be in their joint names.

We therefore advise that judgment be rendered in favor of Alfred and Theron A. Todd for the recovery of the demanded premises.

In this opinion the other judges concurred.