## G. S. JOHNSON CO. v. NEVADA PACKARD MINES CO.

### (District Court, D. Nevada. November 20, 1920.)

### No. 2440.

1. **Contracts ☞211—Time is of essence of option.**

   In an option contract, because of its one-sided nature, time is of the essence in equity as well as in law, whether expressly so stipulated or not, and therefore the failure of the optionee to exercise his right of election within the time stipulated in the option or implied by law ends his option rights.

2. **Corporations ☞79—Failure to exercise option to buy mining stock within time given not excused.**

   The effect of the failure of plaintiff promoting company to take and pay for stock of defendant, a company owning an undeveloped mine, within the time given by an option contract, *held* not avoided by the fact that the mine did not develop ore bodies as expected or because of general financial depression, both being contingencies to be anticipated.

3. **Corporations ☞79—Parol agreement as to sale of mining stock by a promotion company merged in written contract.**

   Where a parol agreement relating to the sale by plaintiff promoting company of stock of defendant mining company was followed three days

later by a writing, signed by defendant and accepted by plaintiff, giving plaintiff an option to purchase the same stock at times and on terms therein stated, such option contract *held*, under Civ. Code Cal. § 1625, to have superseded the previous agreement and to measure the rights of the parties.

4. **Contracts** ⚭242—**Parol modification of written contract extending time of performance not effective.**

Under Civ. Code Cal. § 1698, providing that "a contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise," an oral agreement, made after default in performance of a written contract by plaintiff, extending the time for performance, without other consideration than plaintiff's renewed promise to perform, *held* not a modification of the written contract, binding on the other party prior to full execution of the agreement by plaintiff, nor, under such statute, was the other party by acceptance of part performance estopped to insist on the terms of the written contract.

5. **Corporations** ⚭79—**Acceptance of payments after default not waiver of subsequent defaults by promoting company, given options on mining company stock.**

Where by a written contract plaintiff promoting company was given an option to purchase treasury stock of defendant mining company in installments, the stock to be issued as paid for, conditioned on its taking stated amounts on or before stated times at stated prices, acceptance of payments and issuance of stock therefor after plaintiff was in default as to certain of the installments *held* not a waiver of subsequent defaults.

6. **Corporations** ⚭79—**Motive in canceling option contract immaterial.**

The motive which actuated a mines company in declaring canceled a contract giving an option to promoting company to purchase its stock, for which it had legal grounds, *held* immaterial, in the absence of fraud or other conduct creating an estoppel.

7. **Frauds, statute of** ⚭144—**Invalid oral agreement to extend option in writing not effective as equitable estoppel.**

An oral agreement to extend an option given plaintiff by a written contract, made after plaintiff's default and invalid in law to change the contract, *held* not to estop the other party from canceling the contract for future defaults, where it appeared that plaintiff was not misled, nor induced thereby to omit compliance with the contract.

8. **Estoppel** ⚭52—**Is a protective, and not an offensive, weapon.**

An estoppel is a matter of defense, and its operation is limited to saving harmless or making whole the person in whose favor it arises, and it cannot be made an instrument of gain or profit.

9. **Words and phrases—"Waiver."**

A "waiver" is the intentional abandonment or relinquishment of an existing right. It must be manifested in some unequivocal manner; and to operate as such it must in all cases be intentional and voluntary, and may be accomplished by agreement or by conduct.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Waiver.]

At Law. Action by the G. S. Johnson Company against the Nevada Packard Mines Company. On demurrer to complaint. Sustained in part.

Augustus Tilden, of Reno, Nev., for plaintiff.

Cheney, Downer, Price & Hawkins, of Reno, Nev., for defendant.

FARRINGTON, District Judge. Plaintiff brings this action at law to recover damages in the sum of $79,010.76 for an alleged breach

of a contract. The case comes before the court at this time on defendant's demurrer to, and motion to strike certain portions of, the complaint. Plaintiff alleges that at San Francisco, March 14, 1914, defendant entered into an oral contract with plaintiff, wherein plaintiff agreed to—

"immediately institute and continuously prosecute to its utmost capacity a campaign to stimulate public interest in said shares and thereby procure purchasers for 400,000 shares thereof at the following prices net to defendant: Ten cents per share for 100,000 shares, 12½ cents per share for 100,000 shares, 15 cents per share for 100,000 shares, and 17½ cents per share for 100,000 shares; said sales to be so effected as to enable defendant to realize the following sums at the following times: $4,000 on or before May 10, 1914; $5,000 on or before June 10. 1914; $6,000 on or before July 10, 1914; $7,000 on or before August 10, 1914; $8,000 on or before September 10, 1914; $9,000 on or before October 10, 1914; $10,000 on or before November 10, 1914; and $6,000 on or before December 10, 1914; that, notwithstanding the specification of amounts and dates as aforesaid, plaintiff would not be strictly bound thereby, but would be strictly bound only to keep defendant in sufficient funds to enable it to accomplish its said purpose; that in no other respect would time be deemed to be of the essence of plaintiff's performance."

On the same day, March 14, 1914, the defendant company adopted a resolution, which, in so far as it is material, reads as follows:

"On motion, duly made, seconded, and carried, it was resolved: That the Nevada Packard Mines Company sell to the G. S. Johnson Company of San Francisco, California, 400,000 shares of treasury stock on the terms, prices and conditions as follows: One hundred thousand shares at the rate of 10 cents per share; one hundred thousand shares at the rate of 12½ cents per shares; one hundred thousand shares at the rate of 15 cents per share; one hundred thousand shares at the rate of 17½ cents per share. That the said stock be paid for by G. S. Johnson Co. as follows: $4,000 on or before May 10, 1914; $5,000 on or before June 10, 1914; $6,000 on or before July 10, 1914; $7,000 on or before August 10, 1914; $8,000 on or before September 10, 1914; $9,000 on or before October 10, 1914; $10,000 on or before November 10, 1914; $6,000 on or before December 10, 1914. Stock to be escrowed with the Merchants' National Bank of San Francisco, with instructions to deliver as requested by the G. S. Johnson Company upon receipt of payments as above set out."

Three days later, in pursuance of the oral agreement and resolution, the defendant company executed the following option in writing:

"For and in consideration of one ($1.00) dollar and other valuable considerations to the undersigned corporation in hand paid, the receipt of which is hereby acknowledged, the undersigned corporation, acting through its officers hereunto duly authorized, does hereby give and grant to the G. S. Johnson Company, a corporation, an option to purchase one hundred thousand (100,000) shares of the treasury stock of the Nevada Packard Mines Company at ten (10¢) cents per share net to the said company, provided the same is purchased and paid for as follows, to wit: 40,000 shares on or before May 10, 1914; 50,000 shares on or before June 10, 1914; and 10,000 shares on or before July 10, 1914.

"And in the event the said the G. S. Johnson Company purchases all of the said one hundred thousand (100,000) shares as hereinbefore provided and pays for the same as herein provided, the Nevada Packard Mines Company does hereby give and grant to the said G. S. Johnson Company an option to purchase an additional one hundred thousand (100,000) shares of the treasury stock of said company at and for the sum of twelve and one-half (12½)

cents per share, provided the same is purchased and paid for as follows, to wit: 40,000 shares on or before July 10, 1914; 56,000 shares on or before August 10, 1914; and 4,000 shares on or before September 10, 1914.

"And in the event the said the G. S. Johnson Company purchases all of the said two hundred thousand (200,000) shares as hereinbefore provided and pays for the same as herein provided, the Nevada Packard Mines Company does hereby give and grant to the said the G. S. Johnson Company an option to purchase an additional one hundred thousand (100,000) shares of the treasury stock of said company at and for the sum of fifteen (15¢) cents per share, provided the same is purchased and paid for as follows, to wit: 50,000 shares on or before September 10, 1914; and 50,000 shares on or before October 10, 1914.

"And in the event the said the G. S. Johnson Company purchases all of the said three hundred thousand (300,000) shares as hereinbefore provided, and pays for the same as herein provided, the Nevada Packard Mines Company does hereby give and grant to the said the G. S. Johnson Company an option to purchase an additional one hundred thousand (100,000) shares of the treasury stock of said company at and for the sum of seventeen and one-half (17½) cents per share, provided the same is purchased and paid for as follows, to wit: 8,571 shares on or before October 10, 1914; 57,142 shares on or before November 10, 1914; and 34,287 shares on or before December 10, 1914.

"It is agreed that the undersigned shall deliver stock to the said the G. S. Johnson Company in such amounts and at such times within the dates above stated as the said the G. S. Johnson Company shall direct, and that the said the G. S. Johnson Company shall pay for all stock as and when issued.

"It is agreed and made a part of this contract that so long as the terms of this contract are complied with by the said the G. S. Johnson Company that Augustus D. Cox shall be and remain superintendent of the Nevada Packard Mines Company, with full power to direct the development of the property, at a salary of one hundred and fifty ($150.00) dollars per month, unless mutually agreed by and between the said the G. S. Johnson Company and the Nevada Packard Mines Company to the contrary.

"Should the said the G. S. Johnson Company fail, neglect, or refuse to purchase stock as hereinbefore provided, or to make said payments or any thereof as herein provided, such failure, neglect or refusal shall work a forfeiture of this option to purchase, and the same shall be null and void as to all amounts of stock mentioned herein unpurchased at the time of such forfeiture."

Thus by the terms of the contract plaintiff was granted an option to purchase 40,000 shares of stock by paying $4,000 therefor on or before May 10th. Plaintiff, however, took but 29,890 shares, and paid defendant only $2,989 prior to that date. Plaintiff was also permitted to buy 50,000 shares additional, by paying therefor $5,000 on or before June 10th. Instead of doing so, only enough stock was taken to yield $3,407.50. This sum, and no more, was then paid by plaintiff to defendant. Thereafter, and on or before July 13th, plaintiff had taken stock from defendant to the amount of $1,164.40, which it paid to defendant, instead of the $6,000 required on or before July 10th. July 13th the Nevada Packard Mines Company notified plaintiff that the option of March 17, 1914, was canceled.

The oral contract of March 14th and the written option of March 17th provided for the sale of 400,000 shares of treasury stock. The oral agreement required plaintiff to endeavor to procure purchasers for the stock. The written agreement gave plaintiff no more than an option to purchase. Time is of the essence of the written contract, and it would be of the oral contract also, but for the provi-

sion that, notwithstanding the specification of amounts and dates, which are the same in both contracts, the plaintiff would not be strictly bound thereby, but would be strictly bound only to keep defendant in sufficient funds to enable it to accomplish its purposes; that in no other respect would time be deemed to be of the essence of plaintiff's performance.

We are bound to assume that the two contracts related to the same 400,000 shares of stock. There is no allegation to the contrary, and it appears that defendant owned, all told, no more than 500,000 shares. There is nothing in the complaint which indicates defendant was bound to furnish plaintiff 400,000 shares of stock for its customers, and also another 400,000 shares under the option. The two agreements relate to precisely the same shares, fix the same prices, and specify the same dates prior to which purchases of the same number of shares are to be made and paid for. There is nothing in the complaint which lends any countenance to the theory that if plaintiff failed to purchase, or lost its right to purchase under the option, it could still proceed under the oral agreement, procure purchasers, and compel defendant to issue stock.

The allegation of the complaint is that "defendant in performance of its part in said campaign (referring to the oral agreement) caused" the above resolution to be adopted by its board of directors. The resolution authorized the sale to plaintiff. The stock was to be placed in escrow and delivered to plaintiff upon receipt of payments in the amounts and prior to the dates set out. Again, it is alleged:

"That on, to wit, the 17th day of March, 1914, the said parties reduced certain parts of said parol agreement to writing, in words and figures following."

Thus, according to the complaint, the written agreement covers part of the oral agreement, and to that extent it merges and supersedes the original agreement. What, then, if anything, remains of the oral agreement? At most, nothing but a promise on plaintiff's part, not to make, but endeavor to make, a market for the stock. The written option provides the only method by which, the only terms within which, the only prices for which, and the only quantities in which plaintiff can compel a delivery of the stock.

Under the agreement of March 14th, as thus modified and superseded by the option of March 17th, time is of the essence of any and all obligations which defendant assumed to deliver, issue, or sell any part or portion of the 400,000 shares. This is clearly expressed in the contract itself. Failure to exercise the option to purchase stock did not constitute a forfeiture of a right; it was rather a failure to perform a condition precedent to the existence of a right to purchase. For instance, in the option given by Mark Walser, he grants plaintiff an option on a given number of his shares in case plaintiff first purchases a definite number of shares of treasury stock from the company, and pays for the same within a limited time; and plaintiff's right to purchase each successive block of 100,000 shares of stock from the company expressly depends upon its having purchased and paid for

the previous block of 100,000 shares within the time fixed in the agreement. But, in order to make this absolutely certain, the parties inserted in the option the so-called "forfeiture clause," which provides that, should plaintiff—

"fail, neglect, or refuse to purchase stock as hereinbefore provided, or to make said payments or any thereof as herein provided, such failure, neglect or refusal shall work a forfeiture of this option to purchase, and the same shall be null and void as to all amounts of stock mentioned herein unpurchased at the time of such forfeiture." James on Option Contracts, § 920.

The plaintiff never signed the option. It was not bound therein, or by the previous oral agreement, to procure a single purchaser, to purchase a single share of stock, or to continue the campaign for any definite time. Defendant alone was bound—bound to sell plaintiff property of uncertain and fluctuating value, for a limited time, at fixed prices, and only for the sums stipulated.

[1] The decisions concur in holding that in an option contract, because of its one-sided nature, time is of the essence, in equity as well as at law, whether expressly so stipulated or not, and that therefore the failure of the optionee to exercise his right of election within the time stipulated in the option, or implied by law, ends his option rights. This rule is especially applicable to mining property. James on Option Contracts, §§ 862, 920; Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479; Gaines v. Chew (C. C.) 167 Fed. 630, 635; 2 Lindley on Mines (2d Ed.) § 859.

[2] Confessedly plaintiff was in default in that it failed to perform the conditions precedent to its right to a further exercise of the option. There is no averment that plaintiff ever paid or offered to pay on or before any date mentioned in the option, for shares approximating the minimum number then limiting defendant's obligation. Plaintiff seeks to avoid the effect of its default, or rather of its failure to perform the prescribed conditions, by alleging unforeseen difficulties, modification of the contract, waiver, and estoppel. The unforeseen difficulties were: First, the work in the mines failed to develop anticipated new ore bodies of such magnitude and commercial value as to assist in the campaign; and, second, after executing the contract a period of unforeseen financial apathy set in throughout the United States, and continued throughout the campaign, so that owners of capital were unusually reluctant to invest in mining industries.

Such unforeseen difficulties are to be anticipated by every one who engages in opening undeveloped mines, or in selling mining stock; they are the hazards of the business, and do not constitute mistakes, either in law or in fact. If plaintiff had desired other protection than that afforded by an arrangement under which there was no obligation on its part to buy or sell a single share of stock, it should have secured some provision therefor in the option. As it is, there is no allegation of any misrepresentation as to financial conditions, as to the existence of ore bodies, as to the probability of making immediate and valuable discoveries, or that defendant was in any way responsible for plaintiff's failure to purchase stock or to procure buyers therefor.

Verzan v. McGregor, 23 Cal. 339, cited by plaintiff, is not in point.

In that case there was a misrepresentation by the owner as to the length of the tunnel to be dug, and as against the contractor who had been deceived by the misrepresentation, a time limit was held void.

The difficulties experienced by G. S. Johnson Company in selling the stock cannot be permitted to enlarge or modify the terms of the written option. Columbus R. P. & L. Co. v. Columbus, 249 U. S. 399, 412, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648, 1658; United States v. Gleason, 175 U. S. 588, 602, 20 Sup. Ct. 228, 44 L. Ed. 284; Dermott v. Jones, 2 Wall. 1, 17 L. Ed. 762. In Columbus R. P. & L. Co. v. Columbus, supra, Mr. Justice Day says:

"If a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail. * * * The latest utterance of this court upon the subject is found in Day v. United States, 245 U. S. 159, in which it was said: 'One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking. The modern cases may have abated somewhat the absoluteness of the older ones in determining the scope of the undertaking by the literal meaning of the words alone. * * * But when the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risk of the obstacles to that extent.' "

[3] It is stated in the complaint that the agreements—

"were wholly made, and at the time of making thereof were intended by the parties wholly to be performed, and as far as performed were wholly performed, in the state of California."

We must therefore look to the law of that state. Section 1625 of the Civil Code provides:

"The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

Section 1697 of the Civil Code reads thus:

"A contract not in writing may be altered in any respect by consent of the parties, in writing, without a new consideration, and is extinguished thereby to the extent of the new alteration."

See James on Option Contracts, § 408; 2 Lindley on Mines, § 859; Snow v. Nelson (C. C.) 113 Fed. 353, 356.

We must then conclude that the transactions of March 14th, in so far as they were negotiations, were merged in the written option, and, in so far as they constituted an oral contract covered by stipulations of the option, they were extinguished, and must give way to the latter.

[4] It is alleged that—

"plaintiff became unwilling and notified defendant that it was unwilling further to persist in said campaign, unless defendant would expressly and forever waive the clauses in the nature of conditions and the forfeiture clause in said writing of March 17, 1914, and would expressly agree to deliver the balance of said 400,000 shares at the said stipulated prices on the sole condition that plaintiff keep defendant throughout said campaign in sufficient

funds, estimated at between $2,000 and $2,300 per month, to keep said development work in progress; that defendant in consequence of said notice, and as an inducement to plaintiff to persist in said campaign, and in consideration of plaintiff's promise to persist in said campaign, and to provide defendant throughout said campaign with sufficient funds, estimated at from $2,000 to $2,300 per month, to keep said development work in progress, orally agreed to and did thereupon orally waive all of said conditions and said forfeiture clause, and orally agreed to deliver the balance of said 400,000 shares at said stipulated prices."

The complaint proceeds on the theory that this oral understanding of June 21st was a modification of the option of March 17th. There is no suggestion that the contracts of March 14th and 17th were thereby extinguished, and that a new contract was thus substituted for them, or either of them.

Section 1698 of the California Civil Code reads thus:

"A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

The modifying contract was not in writing; it was still executory July 13th, and never had been executed, except as to the limited number of shares which were bought and paid for on and before that date. There is no averment to the contrary. "It is difficult," as the court says in Henehan v. Hart, 127 Cal. 656, 658, 60 Pac. 426, 427, "to conceive how an oral agreement extending the time in which a written agreement is to be performed can be executed until the time has elapsed. * * * If the period of time mentioned in the oral agreement has not elapsed, then the agreement has not been executed."

It is also urged, and with much reason, that the agreement of June 21st is invalid because there was no consideration. The promise not to abandon the campaign, and to persist therein, was merely a promise to do something which plaintiff had already agreed to do. In the contract of March 14th plaintiff agreed to prosecute the campaign, but for no definite time. In the oral modifying agreement of June 21st there was the same agreement to prosecute the campaign, but again for no definite time. Plaintiff had the same right to abandon the second agreement as to abandon the first. That the plaintiff would not abandon the campaign was as much a part of one contract as of the other. Unquestionably there are some authorities to the effect that a party to a contract has the right to elect whether he will perform it, or abandon it and pay damages, and that his giving up this right of election furnishes a consideration for a new promise to perform what he was to do under the original contract. According to the Circuit Court of Appeals of this Circuit, however, this rule is not only contrary to the weight of authority, but wrong in principle. Alaska Packers' Ass'n v. Domenico, 117 Fed. 99, 105, 54 C. C. A. 485, 13 Corpus Juris, 354.

The modifying agreement of June 21st being still executory July 13th, and not in writing, was therefore invalid, and effected no modification of the option. Beeson v. Wright, 159 Cal. 133, 112 Pac. 1091, 1092; In re McDougald's Estate, 146 Cal. 196, 79 Pac. 875; Emerson-Brantingham Implement Co. v. Ware (Okl.) 174 Pac. 1066; Kins-

man v. Stanhope, 50 Mont. 41, 144 Pac. 1083, L. R. A. 1916C, 443, 445; Beaver v. Continental B. & L. Ass'n, 15 Cal. App. 190, 116 Pac. 1105; Harloe v. Lambie, 132 Cal. 133, 64 Pac. 88.

If the oral agreement of June 21st was insufficient to extend plaintiff's time, to eliminate from the option the forfeiture and condition precedent clauses, or to substitute for such clauses a promise on defendant's part to deliver the balance of said "400,000 shares at said stipulated prices on the sole condition that plaintiff keep defendant throughout said campaign in sufficient funds, estimated at between $2,000 and $2,300 per month, to keep said development work in progress," the question next arises whether that result could have been produced by the alleged waiver and estoppel. The answer is furnished by the Code section above quoted:

"A contract in writing may be altered by a contract in writing, or by an executed oral agreement, *and not otherwise.*"

Thus the only two methods by which a contract in writing may be altered are prescribed; and all others, as by waiver or by estoppel, are excluded. Platt v. Butcher, 112 Cal. 634, 44 Pac. 1060; Beeson v. Wright, 159 Cal. 133, 112 Pac. 1091; Benson v. Shotwell, 103 Cal. 163, 37 Pac. 147; Neverman v. Bank, 14 Okl. 417, 78 Pac. 382; 13 Corpus Juris, 673–694.

Clearly, the contract of March 17th was not changed or modified, nor was any new or additional term added thereto, by the alleged waiver and estoppel. What effect, then, if any was produced by those circumstances?

[5] This leads to a consideration of the facts on which plaintiff relies in support of its plea of waiver and estoppel. It appears from the complaint that on May 10th plaintiff had taken less than 75 per cent. of the shares required by the option, but defendant accepted this as full performance, and importuned plaintiff to persist. June 10th, when plaintiff should have taken altogether 90,000 shares, and paid $9,000 therefor, it had bought in all but 63,965 shares, and paid but $6,396.50 thereof. This performance of June 10th defendant is also alleged to have accepted as full performance, and importuned plaintiff to further persist. Between June 21st and July 13th plaintiff disposed of 11,644 shares, and paid $1,164.40, which defendant received; but there is no averment that this was accepted as full performance. July 11th Mark Walser addressed a letter to plaintiff, in which the hope is expressed that plaintiff will be able to send several thousand dollars during July; but, stating that the property is too valuable to risk liens and attachments, safety required the company to shut down or reduce the force to the minimum, and that the secretary had gone to the mines to consult with the superintendent. Throughout that period defendant repeatedly "expressed to plaintiff its concern on account of the unforeseen disadvantages under which plaintiff was laboring in said campaign, and its satisfaction at the results achieved by plaintiff, and repeatedly importuned plaintiff to persist in said campaign notwithstanding said disadvantages."

Moved by these importunities and expressions of satisfaction, plain-

tiff persisted in said campaign, and expended "great labor and many thousands of dollars, and thereby enabled defendant to pursue its development work, and assured defendant a market for its stock"; that on July 13th defendant wrongfully and without cause, and without notice to plaintiff, and while plaintiff was in reliance upon said circumstances of acquiescence, waiver, and estoppel, as defendant well knew, and was vigorously prosecuting said campaign," notified plaintiff that the option of March 17th was canceled. July 15th plaintiff tendered defendant $355, and demanded 3,550 shares; July 22d plaintiff tendered $370, and demanded 3,700 shares; July 25th plaintiff tendered $276, and demanded 2,760 shares; July 31st plaintiff tendered $2,620, and demanded 26,200 shares. The tenders were refused by defendant on the ground that the contract of March 17th was canceled, and that plaintiff had refused to acknowledge that the contract was at an end. July 31st plaintiff "elected to regard defendant's said conduct as a breach of said parol agreement and writing."

Plaintiff also states that defendant accepted the services of Augustus Cox, a superintendent selected and named by plaintiff, of whose salary of $200 per month plaintiff paid $50 and defendant $150 during the month of July. Defendant did not pay or offer to repay the $50 to plaintiff.

Plaintiff was again in default July 10th, on which date, and not later, it was permitted by the terms of the option to take and pay for 10,000 shares at 10 cents per share, and 40,000 shares at 12½ cents per share, or a total of 50,000 shares for $6,000, which should have been taken and paid for on or before that date in order to preserve the option. Instead, plaintiff took but 11,644 shares, and paid $1,164.40, and not before July 10th, but before July 13th. Thereafter, and up to and including July 31st, plaintiff tendered $3,621, and demanded 36,210 shares. In all, at that date, July 31st, plaintiff had paid for, or offered to pay for, 100,819 shares at 10 cents per share; but the express condition of the option was that, in the event plaintiff purchased all of the 100,000 shares and paid for the same at the price and at the dates specified, he was granted an option to buy 100,000 shares additional at 12½ cents per share, provided the same was purchased and paid for as follows: 40,000 shares on or before July 10th, 56,000 shares on or before August 10th, and 40,000 shares on or before September 10th.

Regarding tenders, it is provided in section 1490 of the Civil Code of California that—

"Where an obligation fixes a time for its performance an offer of performance must be made at that time, within reasonable hours, and not before or afterwards."

Hence the attempts to purchase stock after July 10th, which should have been purchased before that date, in and of themselves could subtract nothing from defendant's right to cancel the option. The practical effect of a contrary rule would have been to enable plaintiff to speculate indefinitely, with little risk to itself, on the possible rise in the value of defendant's treasury stock. Glock v. Howard & Wilson

Colony Co., 123 Cal. 1, 55 Pac. 713, 43 L. R. A. 199, 205, 69 Am. St. Rep. 17.

Walser's letter of July 11th expressed a hope that plaintiff would do better, but said that the secretary of the company had gone to the mine to confer with the superintendent. Two days later plaintiff was notified that defendant's board of directors had decided to cancel the option. On the same day, July 13th, by direction of the defendant's board of directors, Margrave, secretary, wrote to Ray, advising him of the cancellation of the option, and instructing him not to sign any certificates for, or accept any money from, plaintiff until further order of the board of directors, except after written acknowledgment by plaintiff that the contract was at an end. On receipt of such acknowledgment, Ray was authorized to sell plaintiff 30,000 shares of treasury stock at 10 cents per share. There was also a letter, dated July 13th, from the secretary of the defendant company, returning stock certificates sent for transfer, and indicating how transfers should be made in future. That letter dealt exclusively with the manner of transferring stock. In this correspondence of July 11th and 13th there is absolutely nothing which can be construed into a suggestion that defendant intended to waive the default of July 10th.

[6] It appears from the complaint that before July 10th large bodies of valuable ore had been opened in the mines; that defendant knew of these discoveries, and, moved thereby, conceived the design to deprive plaintiff of the profits which would accrue to it, and to that end disregarded the circumstance of waiver and estoppel set out in the complaint, and notified plaintiff that the contract of March 17th was canceled.

The superintendent of the properties had been selected by and was in plaintiff's pay. In the absence of anything to the contrary, we may assume that he was diligent in protecting plaintiff's interest. There is no allegation that plaintiff's information in regard to these discoveries was not as full and timely as defendant's or to indicate that the developments in the mines were misrepresented to, or concealed from, plaintiff, or that plaintiff was otherwise in a position less advantageous than defendant to profit by such developments. On the other hand, it is repeatedly alleged that defendant urged plaintiff to persist in the campaign for the sale of stock. Self-interest certainly should have suggested attention to defendant's urgings. Whether defendant, in canceling the option, was actuated by good, bad, or trivial motives is utterly immaterial. The only question is as to whether it had a legal right to cancel the option; such a right, if it existed, could not be defeated, enlarged, or diminished by showing that the discoveries rendered cancellation of the option profitable or unprofitable to defendant.

It is argued that the foregoing matters reveal defendant's motives, and that defendant's motives are proper subjects of inquiry when the sufficiency of performance is in question. To this the answer is that the insufficiency of plaintiff's performance under the option is admitted in the complaint. There is no suggestion that any one is questioning it; hence defendant's motives in that particular are im-

material. How the discoveries could supply defendant with a motive to importune plaintiff to persist in the campaign, and take more stock at low prices, waive plaintiff's partial performance, or enter into the attempted modification of the option, so that plaintiff could wait developments before deciding whether to invest more than $2,000 or $2,300 per month, is difficult to conceive.

If one party to a contract has been actually misled to his prejudice by the conduct or representations of the other, the latter is estopped to deny that such representations were not true, or that his acts did not represent the real intention and purpose of the parties. This principle is frequently applied in cases involving contracts for the sale of land, where the price is to be paid in installments, with a provision for forfeiture if any installment is not paid on or before the date when due. If the vendor tells the vendee, while the latter is able to procure money necessary for a payment, that an extension of time will be given, and the latter, relying on the assurance, fails to make payment, the law will not permit the vendor to enforce a forfeiture on the ground that his agreement to grant an extension was illegal or without consideration. In such contracts, as distinguished from the contract here under consideration, the payment of each installment is the performance of a condition subsequent; the vendee parts with his money, and acquires a corresponding interest in the property, which is taken away from him if the forfeiture is declared.

In the present contract, defendant for a consideration of $1 granted plaintiff an option to purchase mining stock. There was no obligation to buy a single share; but, if, on or before certain dates, plaintiff tendered to defendant the amount of money stipulated, defendant was bound to issue to plaintiff the equivalent of the money in stock at the price fixed in the contract. Defendant was not bound to sell plaintiff the second block of 100,000 shares at 12½ cents per share, unless plaintiff, on or before July 10th, had taken and paid for 100,000 shares at 10 cents per share, and unless it had also, on or before that date, tendered a sufficient sum to pay for 40,000 shares at 12½ cents per share. Thus the purchase of each block was not a condition subsequent, but a condition precedent to the purchase of more stock. The several payments were not installments of a purchase price for which plaintiff acquired a corresponding interest in the 400,000 shares, but each payment, except in the fact that if made as required it preserved the option, was a completed sale. Plaintiff received the full stipulated value of its money in stock; hence, if it defaulted, it forfeited nothing; it merely failed to acquire the opportunity to buy more.

Assuming that, by accepting the insufficient purchases of May 10th and June 10th as full performance, plaintiff's defaults on those dates were waived, it does not follow that those waivers also constituted a waiver of defendant's right to insist that subsequent performances should be made in the manner provided in the option, or that plaintiff's default of July 10th was thus waived. It is to be noted that the subsequent conduct of the parties shows that the waivers of May 10th and June 10th went only to plaintiff's failure to purchase on time. Both parties understood that plaintiff was still entitled, at least up to

and including the 10th day of July, to buy the residue of the block of 100,000 shares at 10 cents per share, or, as it is suggested in plaintiff's brief, the waivers gave plaintiff a reasonable time to catch up.

It has frequently been held, in cases involving contracts in which time is of the essence, that the mere waiver of one breach does not operate as a waiver of subsequent breaches, or of the right to insist upon payment of subsequent installments as provided in the contract. This is so even in some cases where the breach waived is of a condition subsequent. In other words, it is held that the waiver exhausts itself on the breach actually waived. Thompson v. Insurance Co., 104 U. S. 252, 26 L. Ed. 765; Walsh v. Howard & Childs, 61 Misc. Rep. 328, 113 N. Y. Supp. 499; Bohde v. Farley, 49 N. Y. Super. Ct. 42; 25 Cyc. 870; 39 Cyc. 1349.

In Thompson v. Insurance Co., supra., cited by plaintiff, the fifth premium on a life insurance policy became due January 24th. The company accepted a notice for the premium, payable nine months after date, which provided that the policy would be forfeited if the note were not paid at maturity. The note was not paid, and the insured died in November. The plaintiff alleged in his replication that the insured was ready and willing to pay the promissory note when due, but did not do so because the defendant company had failed to send out its customary notices; that at the time the note was given it was agreed orally that the policy should not be forfeited for nonpayment of the note at maturity, but only on the election of the company, and that the company made no such election until after the death of Thompson; also that it had been the custom of the company, not only in its previous dealings with the deceased, but with others, not to insist on punctual payment, but to give 30 days' grace. Thompson's death occurred 2 weeks before the expiration of the 30 days' grace. It was further alleged that Thompson relied on this leniency and was misled thereby. Demurrers to the replication were sustained. In affirming the judgment, the Supreme Court said:

"An insurance company may waive a forfeiture or may agree not to enforce a forfeiture; but a parol agreement, made at the time of issuing a policy, contradicting the terms of the policy itself, like any other parol agreement inconsistent with a written instrument made contemporary therewith, is void, and cannot be set up to contradict the writing. * * * The last replication sets up and declares that it was the usage and custom of the defendants, practiced by them before and after the making of said note, not to demand punctual payment thereof at the day, but to give days of grace, to wit, for 30 days thereafter; and they had repeatedly so done with Thompson and others, which led Thompson to rely on such leniency in this case. This was a mere matter of voluntary indulgence on the part of the company, or, as the plaintiff herself calls it, an act of 'leniency.' It cannot be justly construed as a permanent waiver of the clause of forfeiture, or as implying any agreement to waive it, or to continue the same indulgence for the time to come. As long as the assured continued in good health, it is not surprising, and should not be drawn to the company's prejudice, that they were willing to accept the premium after maturity, and waive the forfeiture which they might have insisted upon. This was for the mutual benefit of themselves and the assured, at the time, and in each instance in which it happened it had respect only to that particular instance, without involving any waiver of the terms of the contract in reference to their future conduct. The assured had no right, without some agreement to that effect, to rest on such volun-."

tary indulgence shown on one occasion, or on a number of occasions, as a ground for claiming it on all occasions. If it were otherwise, an insurance company could never waive a forfeiture on occasion of a particular lapse without endangering its right to enforce it on occasion of a subsequent lapse."

There are also numerous decisions in which it is held that, where a vendor waives the failure of the vendee to pay an installment of the purchase price, it operates as a temporary suspension of the right to declare a forfeiture for subsequent breaches, until the vendor gives notice to the purchaser that he must thereafter comply with the contract.

These authorities, however, are distinguishable from the present case in this: That in each of them the breach was of a condition subsequent; the purchaser had an interest in the property contracted for, proportionate to the amount of his previous payments; the contract was entire, and a forfeiture would operate to deprive him of his interest in the property. In substantially all such cases, where waiver was held to operate as a temporary suspension of the right of forfeiture, unequivocal acts and demeanor of the vendor had afforded reasonable and proper inducement for the purchaser, relying thereon, to delay subsequent payments. Gray v. Pelton, 67 Or. 239, 135 Pac. 755, 757; Boone v. Templeman, 158 Cal. 290, 110 Pac. 947, 139 Am. St. Rep. 126; Bishop v. Barndt (Cal. App.) 184 Pac. 901; 39 Cyc. 1385.

In the present case the performances alleged to have been waived were all of conditions precedent. On each occasion prior to July 10th, plaintiff received all it had paid for. The property involved was corporate stock, not real estate. Time was of the essence of the option. No conduct, representation, or waiver of delayed performance could operate as a waiver of the option, or excuse subsequent laches on the part of the purchaser, unless it amounted to an equitable estoppel, that is, to a waiver by which the purchaser was misled to his injury. James on Option Contracts, §§ 862, 868, and section 413, note; Gardner v. Clark, 21 N. Y. 399; Rice v. Fidelity & Deposit Co., 103 Fed. 427, 435, 43 C. C. A. 270; Wilkinson v. Blount Mfg. Co., 169 Mass. 375, 47 N. E. 1020; McNulty v. New Richmond Land Co. (Cal. App.) 187 Pac. 97, 98; Helper v. MacKinnon Mfg. Co., 138 Mich. 593, 101 N. W. 804; Barnes v. Denslow, 9 N. Y. Supp. 53;[1] Braitsch v. Kiel & Arthe Co. (Sup.) 114 N. Y. Supp. 872; Bohde v. Farley, 49 N. Y. Super. Ct. 42; Walsh v. Howard & Childs, 61 Misc. Rep. 328, 113 N. Y. Supp. 499, 502.

In Gardner v. Clark, supra, Clark entered into an agreement to sell and deliver 1,000 bushels of barley at 45 cents per bushel, to be paid for as delivered. Clark delivered several loads without receiving payment, and then disposed of the residue elsewhere. Gardner brought an action for damages for nonperformance of the contract. He urged that the delivery of several loads without requiring payment was in law a waiver of the condition of payment for each load as delivered.

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 56 Hun, 640.

The court instructed the jury that if the defendant after the waiver, intended thereafter to require payment for each load as delivered, and thus change the practice which he had begun, he should have given Gardner reasonable notice. The Court of Appeals said:

"It is impossible, I think, to sustain the position here taken by the judge. Upon what principle the omission by the defendant to insist upon his right to payment as to some of the loads of barley delivered can operate as a waiver of his right as to the residue. I am unable to perceive. There would, perhaps, be a legal difficulty in the way of its having this effect, even if so intended. A waiver, like a gift, can only operate in præsenti. When intended to operate in futuro, it is at most only an agreement to waive, which, it would seem, must, like all other agreements, have a consideration. * * * The contract bound Gardner to have the money ready, at all times, at the place of delivery, to pay for each load as it should arrive; and although he might have some reason to suppose, from the delivery of several loads without requiring payment, that the defendant did not intend to insist upon payment in hand for the subsequent loads, yet this mere supposition could not release him from the positive obligation of his contract."

In Walsh v. Howard & Childs, supra, the court says:

"Even assuming that the contract provision was waived in the three previous transactions shown by plaintiffs, the waiver in each case would apply to the particular case only, since each related to an independent transaction. The defendant was at liberty to insist on strict compliance with the contract as to any future transaction of a similar nature."

In Rice v. Fidelity & Deposit Co., supra., Judge Sanborn, speaking for the Circuit Court of Appeals for the Eighth Circuit, says:

"A waiver is either the result of an intentional relinquishment of a known right, or an estoppel from enforcing it. To constitute a waiver, there must be an intention to relinquish the right, or there must be words or acts calculated to induce the other contracting party to believe, and which deceive him into the belief, that the holder of the right has abandoned it; and the party deceived must have acted on his belief, so that an assertion of the right will inflict upon him a loss he would not have sustained if its holder had not appeared to relinquish it."

[7] As the oral agreement of June 21st was insufficient to modify the option, add new terms thereto, or extend plaintiff's time, we are led next to ask: Can it be admitted as evidence of a waiver, not merely of plaintiff's previous defaults, but of the right on defendant's part thereafter to insist on strict performance as to subsequent purchases of stock? This question, under the authorities, must be answered in the affirmative, provided plaintiff, acting in reliance on the oral agreement, was misled to its detriment.

[9] Inasmuch as waiver does not necessarily imply that the party claiming it has been misled to his prejudice, or that the party against whom it is claimed has received a consideration therefor, it may be suggested that, even though there was no consideration for the attempted oral agreement of June 21st, and that that transaction was followed by no change of possession or detriment to plaintiff, still it may be effective as a waiver. A waiver is the intentional abandonment or relinquishment of an existing right; it must be manifested in some unequivocal manner; and, to operate as such, it must in all cases be intentional and voluntary. 40 Cyc. 259, 261. It is accomplished by

agreement or by conduct. 40 Cyc. 262. If by conduct, it is either a deliberate abandonment, or it is by "words or acts," as Judge Sanborn says in Rice v. Maryland Fidelity Co., supra, "calculated to induce the other contracting party to believe, and which deceive him into the belief, that the holder of the right has abandoned it; and the party deceived must have acted on his belief, so that the assertion of the right will inflict on him a loss he would not have sustained if its holder had not appeared to relinquish it." In short, the binding effect of such a waiver is the fact that the complaining party, in reliance upon words and acts, is misled to his detriment.

Waiver by abandonment is not alleged. The attempted oral agreement of June 21st in substance was that defendant should waive all forfeiture clauses and all conditions requiring purchase of any definite number of shares at the times specified, and agree to deliver the balance of said 400,000 shares at the stipulated prices, on the sole condition that plaintiff keep defendant throughout said campaign in sufficient funds, estimated at between $2,000 and $2,300 per month, to keep the development work in progress. There is no averment that the conditional clauses were absolutely and unconditionally waived. As an abandonment this waiver was singularly hedged about and dependent on conditions; it was neither waiver nor abandonment; it was nothing more nor less than a contract. Calling it a waiver could not possibly change its nature, or enable plaintiff to nullify the California statute, which precludes alteration of a written contract, except by agreement in writing, or an executed oral contract. Acceptances of plaintiff's purchases in May and June as full performance, in so far as they could be considered waiver of future performances, were no more than oral promises.

"The doctrine of estoppel by representation is ordinarily applicable only to representations as to facts either past or present, and not to promises concerning the future which, if binding at all, must be binding as contracts. The only case in which a representation as to the future can be held to operate as an estoppel is where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act." 16 Cyc. 752.

In Smiley v. Barker, 83 Fed. 684, 28 C. C. A. 9, it is held that strict performance of a written contract may be waived by oral words, even though such words may be inadmissible in evidence for the purpose of showing a new contract, or modifying a previous one, provided such words have induced the other party to omit such performance.

In 29 Ency. of Law, p. 1102, it is said that the only ground upon which a party will be bound by a waiver contained in an ineffective contract—

"is that the other party has so governed his conduct by virtue of and relying upon the attempted waiver or alteration that it would be aiding a fraud to permit him to deny its validity." 11 Am. & Eng. Ency. L. 425; Insurance Co. v. Mowry, 96 U. S. 544, 24 L. Ed. 674; Elliot v. Whitmore, 23 Utah, 342, 65 Pac. 70, 90 Am. St. Rep. 700, 704.

It is essential to the existence of an equitable estoppel that the representation, whether consisting of words, acts, or omissions, was

believed by the party claiming the benefit of the estoppel; that he actually relied on it, and, while thus believing and relying, he was thereby induced to do or refrain from doing something which he otherwise would have done, in such a manner and to such an extent as to change his position for the worse. He must have been caused thereby to place himself in such a position that he would suffer a loss in consequence of his own act or omission so induced, if the other party were allowed to deny the truth of this representation, or repudiate the effects of his conduct. There must have been actual reliance on the representation causing the injured person to be actually misled. 2 Pomeroy's Eq. Jurisp. §§ 805, 812; Bigelow on Estoppel (6th Ed.) 694; 11 Am. & Eng. Ency. L. 436; 10 R. C. L. 697; Stein v. Leeman, 161 Cal. 502, 119 Pac. 663; Jewett v. Miller, 10 N. Y. 402, 65 Am. Dec. 752; Wythe v. Salem, Fed. Cas. No. 18,121.

It is plainly alleged in the complaint that until plaintiff received notice of the cancellation of the option on July 13, 1914, it was so lulled by defendant's divers acts, omissions, and declarations into a sense of security that it relied thereon, and in consequence refrained from abandoning the campaign, "and in that behalf reasonably expended upwards of $10,000 in the necessary expenses of said campaign, besides great skill and labor, and would otherwise, as defendant well knew, have abandoned said campaign and saved said skill and labor." It is argued that plaintiff's change of position resulted from continuing in, rather than abandoning, the campaign and from its expenditures therein, and that this was the detriment into which it was misled in reliance upon defendant's acts, omissions, and representations. Defendant's representations, plaintiff's expenditures in reliance thereon, and the loss of that which was so expended if the representations were not made good, are attempted to be shown in the complaint. Plaintiff does not stop here, but on this as a basis proceeds to urge that it is entitled as damages to the profits which it would or could have made, had it been permitted to buy the residue of the 400,000 shares of treasury stock. Conceding for the sake of argument, that, as against an action to recover for the expenditures as damages, defendant is estopped by its acts, omissions, and representations, is it, under the allegations of the complaint, likewise estopped as against a demand for such profits? Conceding, again, that the expenditures and vigorous prosecution of the campaign were induced by defendant's acts, omissions, and representations, does it appear that plaintiff's failure, on or before July 10th, to purchase shares of stock in the manner and to the number provided in the option, was also induced or caused by the same acts, omissions, or representations occurring prior to that date? Was plaintiff lulled into such a sense of security by defendant that it refrained from purchasing and paying for the full 100,000 shares at 10 cents per share, and from purchasing an additional 40,000 shares at 12½ cents per share on or before July 10th? It is impossible to answer these questions in the affirmative, because the complaint declares that defendant encouraged and importuned plaintiff to persist in the campaign; in effect, to comply with the option and to take as much stock as possible; furthermore, it is alleged that

plaintiff vigorously prosecuted said campaign—that it prosecuted the campaign to its utmost capacity.

It is alleged that, after the defaults of May 10th and June 10th, the unfavorable conditions had become so bad that plaintiff refused to proceed further with the campaign unless defendant agreed to waive and eliminate the forfeiture and condition precedent clauses. This does not indicate any substantial reliance on the alleged fact that defendant accepted as full performance the purchases of May 10th and June 10th; on the contrary, it shows lack of reliance, and that plaintiff did not believe a waiver had been made, operative as to its future purchases. It is alleged that on two occasions defendant accepted a partial performance as full performance, but it is nowhere alleged that defendant accepted plaintiff's deficient purchase of July 13th as full performance. The option granted plaintiff the right to purchase 40,000 shares at 12½ cents per share, provided the shares were taken and paid for on or before July 10th; but plaintiff never offered to take a share of stock at that price. Furthermore, there is nowhere in the complaint any showing that plaintiff had or could obtain the money, or that it had or could have procured buyers to purchase shares according to the terms of the option.

I am not overlooking the allegation in paragraph 15 of the complaint that up to the 13th day of July plaintiff performed all the terms and conditions of said parol agreement, and of said writing on its part to be kept and performed, for elsewhere the complaint shows clearly that plaintiff failed on July 10th to take and pay for the stock required by the option. There is no showing in the complaint that this expenditure of $10,000 of labor and skill in any wise induced or caused plaintiff to refrain from buying stock. The same may be said as to the fact that plaintiff paid Mr. Cox, superintendent of defendant's mines, $50 for his services in July, and of the correspondence of July 11th and 13th, which is set out in the complaint. It does not appear whether plaintiff paid the $50 to Cox before or after it failed, on the 10th day of July, to purchase and pay for the requisite number of shares. Again, there is no allegation showing when the $10,000 was expended, except the statement that it was so expended because of plaintiff's faith in defendant's intention "fully to perform the terms of said parol agreement and writing." The parol agreement was made about June 21st, and the option was canceled 22 days later. The parol agreement does not bear witness to any strong reliance by plaintiff on defendant's previous waivers, and certainly no expenditure prior to May 10th could have been induced by any reliance on occurrences subsequent to that date. The great difficulty with the theory on which plaintiff claims profits by estoppel is the lack of allegations showing that its failure to purchase stock was due to its reliance on anything said or done by defendant prior to July 13th, when the option was canceled, rather than to its own financial inability.

Plaintiff's prayer is for $79,010.76 damages, the estimated profits which it would have made, had it purchased the residue of the 400,-000 shares on the terms mentioned in the option. There is also a

prayer for general relief, perhaps intended to cover expenditures on the campaign.

Recovery for breach of the agreement of June 21st is impossible, because that agreement was invalid. Inasmuch as plaintiff never fully performed conditions precedent required in the option, particularly the one to be performed July 10, 1914, there can be no recovery of profits which plaintiff might have made on the option, unless plaintiff is aided by the alleged estoppel. The effect of such an estoppel, the measure of its protection to the party invoking it, is limited to the act done or omitted by him in reliance on the act, omission, or representation of the party to be estopped. It cannot extend to acts done or omitted by him not induced by such reliance. Moreover, such an estoppel cannot be made an instrument of gain or profit; the party invoking its aid can recover no more, under its application, from his opponent as damages, than an amount which is a fair and even compensation for the injury resulting directly and proximately from his own act or omission, performed in actual reliance upon the representation, whether of words, conduct, or silence, on which the estoppel is claimed.

[8] I take it that this is merely an application, to cases arising under the doctrine of estoppel, of the rule that a plaintiff can recover by way of damages an even equivalent, and no more than an even equivalent, for the injury he has suffered as the direct and proximate result of defendant's negligence. No principle is clearer than that an estoppel is a matter of defense; it was never intended to work a positive gain to the party setting it up. Townsend Savings Bank v. Todd, 47 Conn. 190, 219; Green v. Stevenson (Tenn. Ch.) 54 S. W. 1011, 1014; 10 R. C. L., p. 698.

At section 813, vol. 2, of Pomeroy's Equity Jurisp., it is said:

"The measure of the operation of an estoppel is the extent of the representation made by one party and acted on by the other. The estoppel is commensurate with the thing represented, and operates to put the party entitled to its benefit in the same position as if the thing represented were true."

At page 725 of 16 Cyc., it is said:

"The estoppel is a protective, and not an offensive, weapon, and its operation should be limited to saving harmless or making whole the person in whose favor it arises, and should not be made an instrument of gain or profit."

Again, on page 783 of the same volume of Cyc., it is said:

"As a general rule the estoppel is commensurate with the thing represented and operates to put the party entitled to its benefit in the same position as if the thing represented were true, and can neither be extended beyond nor cut below the natural and reasonable import of the representation. It in no case extends beyond the act done or omitted in reliance on the conduct or representation of the party sought to be estopped."

On page 1082 of 39 Cyc., the following language is found:

"But in no event will the purchase of a usurious security at a discount be protected by the equitable principle of estoppel to a greater extent than to give him again what he has paid for the security with lawful interest thereon. It would be inequitable to allow him to exact the face value."

To the same effect see Baker v. Wood, 157 U. S. 212, 15 Sup. Ct. 577, 39 L. Ed. 677; Johnson v. Upper, 38 Wash. 693, 80 Pac. 801; Townsend Savings Bank v. Todd, 47. Conn. 190; Bolitho v. East, 45 Utah, 181, 143 Pac. 584; Phillipsburgh Bank v. Fulmer, 31 N. J. Law, 52, 86 Am. Dec. 193; In re Hill's Estate, 79 N. J. Eq. 521, 82 Atl. 338, 350; Wormser v. Rubinstein, 89 Misc. Rep. 388, 151 N. Y. Supp. 911; Campbell v. Nichols, 33 N. J. Law, 81, 86; Payne v. Burnham et al., 62 N. Y. 69; Kemper v. Industrial Acc. Com., 177 Cal. 618, 171 Pac. 426.

In Kemper v. Industrial Acc. Commission, supra, the employer and insurer agreed to waive the statute of limitations as to an injured servant's claim, provided the claim were filed with the Insurance Commission of California within a reasonable time. This agreement was made September 21, 1916. The claim should have been filed under the law within six months after September 29, 1915. The court held that the parties could make such an agreement, and that it might operate as an estoppel to the plea of the statute of limitations; but as Kemper on October 16th, less than one month after the agreement had been made, arranged for the preparation and filing of his claim, he no longer relied on the agreement to forego the statute, for he obviously intended to wait no longer. Through the neglect of the person charged with the preparation of the claim, it was not filed until March 5, 1917. The court then refused to enforce the estoppel because:

"Estoppel 'in no case extends beyond the act done or omitted in reliance on the conduct or representation of the party sought to be estopped.' * * * The person asserting an estoppel must be induced to act or refrain from acting by his opponent's conduct."

Payne v. Burnham et al., supra, was a foreclosure suit brought by Payne as assignee of the original mortgagee. The mortgage purported to secure an indebtedness of $2,000; Payne bought it for $1,755. After he had paid $500 of this amount, the mortgagors made an affidavit, which Payne read, stating that the consideration for the mortgage was the full amount stated therein. Relying on this affidavit, Payne paid the balance, $1,255. The mortgage was void under the usury law. The court held that the mortgagors were estopped to deny the truth of the affidavit only to the extent that Payne had acted in reliance thereon, and therefore plaintiff was entitled to recover only $1,255; and inasmuch as he was not relying on the affidavit when he paid the $500, because the affidavit was not then in existence, as to that payment the mortgagors were not estopped to deny the truth of the affidavit, and show the mortgage was void.

In Baker v. Wood, supra, it appears that Baker had recovered a judgment against Lake county, Colo., for the sum of $16,054.27. This judgment he sold and assigned to an attorney named Hulburd. On its face the assignment purported to be an absolute transfer of Baker's entire interest in the judgment. In truth, however, the assignment was only made to Hulburd to facilitate collection. Hulburd caused the assignment to be recorded in the court where the judgment had been rendered, and subsequently sold it to Seely and Wood for

$2,500. As soon as Baker was made aware of this fact, he notified Seely and Wood, and also the county of Lake, that he was still the owner of the judgment. Seely and Wood resisted his claim, whereupon Baker brought suit in the Circuit Court of the United States for the District of Colorado. At the hearing his bill was dismissed on the ground that having clothed Hulburd with apparent ownership of the judgment, he was estopped from asserting any interest therein as against Seely and Wood, who occupied the position of bona fide purchasers for value without notice. The Supreme Court of the United States, however, reversed the judgment in these words:

"Granting, then, that Hulburd was clothed with apparent ownership, yet that was qualified by the representation, and the measure of the operation of the estoppel was limited accordingly. The doctrine invoked is purely equitable and ought not to be extended, under circumstances like these, beyond permitting the person misled to recover indemnification. * * * The extent of the loss which Seely and Wood would sustain, if truth of the representation were denied, would be the money they had paid, and to that it appears to us their interest in the judgment must be confined."

I am therefore constrained to conclude, and it is so ordered, that plaintiff has failed to state a cause of action entitling it to recover any part or portion of the $79,010.76 claimed as damages for loss of profits. To that extent defendant's demurrer is sustained; otherwise, it is overruled. Matters contained in the complaint will be stricken as follows:

All of paragraph 5; all of paragraph 6; all that portion of paragraph 7 beginning with the words "that system," line 19, page 3, and including the remainder of the paragraph; and all of paragraph 14.

Plaintiff may have 20 days within which to take such steps as it may be advised.